# IN RE DARLENE C.*
## (SC 15886)

Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued May 28—officially released September 15, 1998

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Eliot D. Prescott,* assistant attorney general, with whom were *Gregory T. D'Auria,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Carolyn K. Querijero* and *Susan T. Pearlman,* assistant attorneys general, for the appellant (petitioner).

*Martha Stone* filed a brief for the Center for Children's Advocacy, Inc., et al., as amicus curiae.

*Opinion*

PALMER, J. The petitioner, the commissioner of the department of children and families (commissioner), appeals from the portion of the trial court's judgment permanently enjoining her from filing, in Superior Court, petitions for the termination of parental rights (termination petitions) that have been prepared, signed and filed by persons who are not admitted to the practice of law. We reverse the judgment of the trial court insofar as it enjoins the commissioner's nonlawyer representatives from preparing, signing and filing termination petitions.

The relevant facts and procedural history are undisputed. On February 20, 1997, a social worker employed by and acting on behalf of the department of children

and families (department) filed a petition, pursuant to General Statutes (Rev. to 1997) § 17a-112,[1] to terminate the parental rights of the respondents, Beatrice C. and Darrel S., with respect to their minor child, Darlene C.[2] Although the social worker had signed the termination petition, her signature was not verified.

Following a trial on the merits, the trial court, in a memorandum of decision dated January 2, 1998, determined that Darrel S. had completely abandoned the child and that Beatrice C. had no ongoing relationship with her, both proper statutory grounds for the termination of parental rights. See General Statutes § 17a-112 (c).[3] The court, however, dismissed the petition without

[1] General Statutes (Rev. to 1997) § 17a-112 provides in relevant part: "Termination of parental rights of child committed to commissioner. (a) In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in a pending or prior proceeding, or an attorney appointed by the Superior Court on its own motion, or an attorney retained by such child after attaining the age of fourteen, may petition the court for the termination of parental rights with reference to such child."

The legislature recently amended § 17a-112. See Public Acts 1998, No. 98-241, § 8. The 1998 amendments to § 17a-112 are not relevant to this appeal. Hereafter, all references in this opinion to § 17a-112 are to the 1997 revision.

[2] Darlene C. has been in the custody of the commissioner and has remained in foster care since immediately after her birth in January, 1994.

[3] General Statutes § 17a-112 (c) provides in relevant part: "The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that over an extended period of time, which except as provided in subsection (d) of this section shall not be less than one year, provided such time limit shall not apply to subparagraph (e) of this subsection: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; [or] . . . (D) [t]here is no ongoing parent-child relationship . . . ."

prejudice to its refiling[4] on the basis of two purported defects: (1) the petition had not been executed by the social worker under oath as required by Practice Book § 1023.1 (*l*),[5] now Practice Book § 26-1 (*l*); and (2) the petition had been drafted, signed and filed by a person who was not an attorney.[6] With respect to the latter ground for dismissal, the court determined that the conduct constituted the unauthorized practice of law. Consequently, the court, without first affording the commissioner an opportunity to be heard, invoked its authority under General Statutes § 51-88 (c),[7] and Prac-

[4] The judgment of the trial court also provided that, in view of the fact that the commitment of Darlene C. was to expire on February 17, 1998, "[the] child remains committed to the Commissioner of the Department of Children and Families." No appeal has been taken from that portion of the judgment.

[5] Practice Book § 1023.1, now Practice Book § 26-1, provides in relevant part: "Definitions Applicable to Proceedings on Juvenile Matters"

"(*l*) 'Petition' means a formal pleading, executed *under oath* alleging that the respondent is within the court's authority to adjudicate the matter which is the subject of the petition by reason of cited statutory provisions and seeking a disposition. Except for a petition for erasure of record, such petitions invoke a judicial hearing and shall be executed by any one of the parties authorized to do so by statute, provided a delinquency petition may be executed by either a probation officer or juvenile prosecutor." (Emphasis added.)

The two statutory provisions that authorize the termination of parental rights, General Statutes §§ 17a-112 (a) and 45a-715, specify that the procedure shall be initiated by means of petition. Practice Book § 35-1, formerly Practice Book § 1055.1, contains the same requirement.

[6] The commissioner subsequently filed a corrected termination petition with respect to Darlene C.

[7] General Statutes § 51-88 provides in relevant part: "Practice of law by persons not attorneys. (a) A person who has not been admitted as an attorney under the provisions of section 51-80 shall not: (1) Practice law or appear as an attorney-at-law for another, in any court of record in this state, (2) make it a business to practice law, or appear as an attorney-at-law for another in any such court, (3) make it a business to solicit employment for an attorney-at-law, (4) hold himself out to the public as being entitled to practice law, (5) assume to be an attorney-at-law, (6) assume, use or advertise the title of lawyer, attorney and counselor-at-law, attorney-at-law, counselor-at-law, attorney, counselor, attorney and counselor, or an equivalent term, in such manner as to convey the impression that he is a legal practitioner of law, or (7) advertise that he, either alone or with others, owns, conducts

tice Book § 29,[8] now Practice Book § 2-44, and, sua sponte, ordered the commissioner to "cease and desist from the further unauthorized practice of law; to wit, filing petitions for the termination of parental rights in the Superior Court for Juvenile Matters, drafted, signed and filed by persons not admitted to the practice of law . . . ."[9]

In support of its decision to enjoin the drafting, signing and filing of termination petitions by nonlawyers, the court remarked, first, on the serious nature of the rights implicated in the context of termination petitions, and the history of problems that the court had observed as a result of faulty pleadings prepared by department personnel not admitted to the practice of law.[10] The

or maintains a law office, or office or place of business of any kind for the practice of law. . . .

"(c) Any person who violates any provision of this section shall be deemed in contempt of court, and the Superior Court shall have jurisdiction in equity upon the petition of any member of the bar of this state in good standing or upon its own motion to restrain such violation."

[8] Practice Book § 29 provides in relevant part: "The superior court . . . may, for just cause, punish or restrain any person engaged in the unauthorized practice of law."

[9] It is undisputed that the current commissioner of the department, Kristine D. Ragaglia, is an attorney admitted to the practice of law in this state. Consequently, the order does not preclude her from personally drafting, signing and filing termination petitions.

[10] To illustrate this point, the court identified four cases over which it had presided since 1993 in which it had observed that neglect or termination petitions, drafted and filed by social workers who were not attorneys, had been flawed. See *In re Victor G.*, Superior Court, judicial district of Middlesex, Juvenile Matters, Child Protection Session at Middletown, Docket No. UO6-CP95-00210 (November 13, 1997) (improper ground for termination pleaded); *In re Cassandra B.*, Superior Court, judicial district of Middlesex, Juvenile Matters, Child Protection Session at Middletown, Docket No. T11-CP96-000141 (November 4, 1997) (three of four possible grounds for termination alleged, at least one without factual or legal basis); *In re Sarah Ann K.*, Superior Court, judicial district of Middlesex, Juvenile Matters, Child Protection Session at Middletown, Docket No. CP94-000507A (January 29, 1997) (although nearly all grounds for termination of parental rights were alleged, most were inappropriate); *In re Janie Marie W.*, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. SCJM

court observed that improper pleadings occur "with great frequency in juvenile court proceedings throughout the state [and] have led to public harm in that [1] they have delayed the proceedings; [2] they have put the respondents, and the State, to unnecessary expense for lawyers, publication expenses and related costs of service; [3] they have wasted available court time and staff resources; [4] [t]he time invested by [social workers] in preparing inadequate legal cases is time that could far better be spent improving their performance of the social service vocation for which they are trained . . . and . . . [5] they have needlessly extended the already unacceptable time frame for permanent placement and adoption of children."[11] (Citation omitted; internal quotation marks omitted.)

The court next examined the nature of the individual tasks relating to termination petitions that are performed by nonlawyers and concluded that such activities constituted the practice of law by persons who are not attorneys in violation of § 51-88.[12] Acknowledging that "[a]ttempts to define the practice of law have not been particularly successful," the court nonetheless observed that "determining the legal theory of a case, drafting the papers necessary to commence a legal action, checking the various possible legal grounds, signing the pleadings and submitting them to the court [are] acts that are commonly understood to [constitute] the practice of law."[13] (Internal quotation marks omitted.) The court noted that the statutory provisions that

DN N-93-325 (November 9, 1993) (improper allegation that child "neglected," rather than "uncared for").

[11] The trial court's statements were based solely upon the court's own experiences in juvenile matters. No hearing was conducted on the issue of injunctive relief because, as we indicated above, the court, sua sponte and without notice to the parties, rendered judgment enjoining the commissioner from filing termination petitions drafted, signed and filed by nonlawyers.

[12] See footnote 7 of this opinion.

[13] The court also observed that, although nonlawyers routinely draft and file petitions on behalf of the commissioner, "it is the custom and practice

authorize the commissioner to *file* termination petitions in court do not expressly authorize nonlawyers also to perform the legal work preparatory to such filings. The court further noted that General Statutes § 17a-47,[14] which discusses the prosecution of *neglect* petitions by attorneys employed by the office of the attorney general, indicates that attorneys are required to perform all the legal work associated with such petitions, and, by implication, termination petitions as well. The court concluded, moreover, that any effort by the legislature to authorize the preparation and filing of pleadings by nonlawyers on behalf of the commissioner would intrude impermissibly into the judicial sphere, thereby violating principles of separation of powers.

The commissioner appealed to the Appellate Court from that portion of the judgment of the trial court ordering her to cease and desist from the unauthorized practice of law,[15] and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice

of the Office of the Attorney General to file an appearance for the . . . Commissioner *after* the petition has been filed . . . ." (Emphasis in original.) In her brief, the commissioner acknowledges that, "[a]lthough assistant attorneys general often review termination petitions before they are filed, some are not reviewed. Due to time constraints and pressing case loads, assistant attorneys general often are unable to review carefully termination petitions prior to their filing. Neglect petitions and motions for [orders of temporary custody] are rarely reviewed by an assistant attorney general prior to filing. However, subsequent to their filing, assistant attorneys general file appearances in the cases and, if necessary, file amended petitions."

[14] General Statutes § 17a-47 provides: "There shall be a legal division which shall consist of attorneys-at-law assigned to each regional office of the department, who shall be assistant attorneys general on the staff and under the direct supervision of the Attorney General. Said division shall diligently prosecute petitions of neglect giving priority to petitions which allege child abuse as the grounds of neglect. The Department of Children and Families shall cooperate with such attorneys in preparation of their cases and shall render such assistance to them as shall be necessary to protect the best interest of the child named in the petition."

[15] The permanent injunction constituted a final judgment for purposes of appeal. See, e.g., *Stamford* v. *Kovac*, 228 Conn. 95, 96–97, 634 A.2d 897 (1993); *Doublewal Corp.* v. *Toffolon*, 195 Conn. 384, 390, 488 A.2d 444 (1985).

Book § 65-1, and General Statutes § 51-199 (c). On appeal, the commissioner contends that the injunction was improper because: (1) the commissioner and her designees are expressly authorized under § 17a-112,[16] and Practice Book § 26-1 (*l*),[17] formerly Practice Book § 1023.1 (*l*), to execute termination and neglect petitions;[18] and (2) the drafting, signing and filing of such petitions do not constitute the practice of law.[19] The commissioner also claims that the issuance of the injunction, without prior notice and an opportunity to be heard, violated her right to fundamental fairness.

[16] See footnote 1 of this opinion.

[17] The text of Practice Book § 26-1 (*l*) is identical to that of its predecessor, Practice Book § 1023.1 (*l*). See footnote 5 of this opinion.

[18] The commissioner maintains that, even though the injunction issued by the trial court applies only to termination petitions, the reasoning of the court applies with equal force to neglect petitions. In support of her contention, the commissioner underscores the fact that the trial court, in its memorandum of decision, characterized the question that it was deciding in broad terms, namely, "whether social workers should be permitted to continue to file *petitions* in the Superior Court for Juvenile Matters." (Emphasis added.) Moreover, the court, in its discussion of the history of the preparation of *petitions and pleadings by department personnel not admitted to the practice of law*, purported to identify problems with respect to the filing of neglect petitions by such persons. See footnote 10 of this opinion. Furthermore, the court relied on § 17a-47; see footnote 14 of this opinion; which covers only neglect petitions, in support of its conclusion that the legislature has limited those who may "do the legal work" associated with termination petitions to attorneys. For the reasons set forth by the commissioner, we agree with her claim regarding the applicability of the trial court's opinion to neglect petitions. For the same reasons, our determination regarding the authority of the commissioner's nonlawyer designees to prepare and file termination petitions is equally applicable to neglect petitions.

[19] Neither the respondents nor the attorney for Darlene C. filed a brief in support of the trial court's judgment with respect to the injunction. One day prior to oral argument, however, the Center for Children's Advocacy, Inc. filed a motion seeking permission to file an amicus curiae brief in support of the trial court's issuance of the injunction, which we granted immediately prior to the commencement of oral argument in this case. We thereafter granted the applications of Greater Hartford Legal Assistance, Inc., New Haven Legal Assistance Association, Inc., Connecticut Legal Services, Inc., and Children's Law Center, Inc. to join the brief of the Center for Children's Advocacy. None of the amici curiae, however, requested permission to participate at the oral argument.

We conclude that, because the drafting, signing and filing of termination petitions by nonlawyer representatives of the commissioner are expressly permitted both by statute and Practice Book section,[20] such activities do not constitute the unauthorized practice of law.[21] We therefore reverse the portion of the trial court's judgment enjoining these practices.[22]

We conclude, first, that the trial court improperly determined that § 17a-112 does not authorize the enjoined activities.[23] Under our statutory scheme, the department is charged with the responsibility of creating and administering a statewide program of services for children and youth who are "abused, neglected, or

---

[20] Because we conclude that these activities are expressly authorized not only by statute but by Practice Book section promulgated by the judges of the Superior Court acting on behalf of the judicial branch, there is no separation of powers violation.

[21] Accordingly, we need not express an opinion about whether these activities constitute the practice of law. Other considerations, moreover, counsel against deciding this question. First, the trial court made its determination sua sponte and without providing the commissioner notice or an opportunity to be heard on the issue. Second, the commissioner is the only party to this appeal. Third, although the Center for Children's Advocacy, Inc. filed an amicus curiae brief, that brief devotes less than one full page to the question of whether the conduct at issue in this case constitutes the practice of law.

[22] Although we need not reach the commissioner's fundamental fairness claim, we nevertheless express our disapproval of the procedure employed by the trial court in rendering an injunction, sua sponte, without first affording the parties notice and an opportunity to be heard. We do not doubt that the action of the trial court, in issuing an injunction against the commissioner, was well intentioned. As we have noted previously in analogous circumstances, however, "[b]asic principles of courtesy and fairness govern the conduct of courts as well as that of litigants and their counsel. The trial court's conduct did not comport with these principles." *Sassone* v. *Lepore*, 226 Conn. 773, 777, 629 A.2d 357 (1993) (trial court determined that state prejudgment remedy statutes were unconstitutional without first affording parties opportunity to present argument).

[23] We note that the trial court's discussion of this issue is limited to the assertion that "[t]he statutes authorizing the Commissioner of the Department of Children and Families to file petitions in the Superior Court do not specifically authorize social workers to do the legal work."

uncared for." General Statutes § 17a-3.[24] Consistent with this responsibility, the legislature has expressly authorized the commissioner to file termination and neglect petitions under § 17a-112,[25] and General Statutes § 46b-129,[26] respectively. Our statutes, moreover, confer upon *designees* of the commissioner, as well, "all . . . powers and duties" necessary to carry out the department's responsibilities. General Statutes § 17a-6 (n).[27]

There is nothing in the unambiguous language of either § 17a-112 (a) or § 46b-129 (a) to suggest that, although the commissioner or her designee may file petitions thereunder, only attorneys are authorized to draft and sign such petitions. "In interpreting the language of a statute, the words must be given their plain and ordinary meaning and their natural and usual sense unless the context indicates that a different meaning was intended." (Internal quotation marks omitted.) *Mattatuck Museum-Mattatuck Historical Society* v.

---

[24] General Statutes § 17a-3 provides in relevant part: "Powers and duties of department. Master plan. The department shall plan, create, develop, operate or arrange for, administer and evaluate a comprehensive and integrated state-wide program of services . . . for children and youth . . . who are . . . abused, neglected or uncared for, including all children and youth who are or may be committed to it by any court . . . ."

[25] See footnote 1 of this opinion.

[26] General Statutes § 46b-129 provides in relevant part: "Commitment of child or youth. Petition for neglected, uncared-for, dependant child or youth. (a) Any selectman, town manager, or town, city, or borough welfare department, any probation officer, the Connecticut Humane Society, or the Commissioner of Social Services, the Commissioner of Children and Families or any child-caring institution or agency approved by the Commissioner of Children and Families, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the Superior Court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent . . . ."

[27] General Statutes § 17a-6 provides in relevant part: "The commissioner or his designee shall . . . (n) [h]ave any and all powers and duties as are necessary to administer the department and implement the purposes of sections 17a-1 to 17a-26, inclusive, and 17a-28 to 17a-49, inclusive . . . ."

*Administrator, Unemployment Compensation Act,*
238 Conn. 273, 278, 679 A.2d 347 (1996). If the legislature
intended to limit the role of nonlawyers in connection
with the drafting of termination and neglect petitions,
it easily could have expressed this intent. See, e.g., *State*
v. *Desimone,* 241 Conn. 439, 455, 696 A.2d 1235 (1997).
That the legislature did not intend such a result is fur-
ther supported by the fact that both §§ 17a-112 and 46b-
129 expressly distinguish between petitions that are to
be filed by attorneys, on the one hand, and petitions
that may be filed by the commissioner or nonlawyers,
on the other.

We also disagree with the trial court that § 17a-47[28]
precludes nonlawyers from preparing neglect peti-
tions—and, by implication, termination petitions—on
behalf of the commissioner. Section 17a-47 provides
that assistant attorneys general who are assigned to
the department shall "diligently prosecute petitions of
neglect," and, further, that the department "shall coop-
erate with such attorneys in preparation of their cases
and shall render such assistance to them as shall be
necessary to protect the best interest of the child named
in the petition." It appears that the trial court construed
the term "prosecute" broadly to encompass not only
the activities that follow the filing of a petition, but also
the work done in preparation of such filing. In common
parlance, however, the term "prosecute" means "to fol-
low to the end: press to execution or completion: pursue
until finished . . . ." Webster's Third New Interna-
tional Dictionary.[29] It is undisputed that the procedures
currently employed by the department and the assistant

_____

[28] See footnote 14 of this opinion.

[29] General Statutes § 1-1 (a) provides in pertinent part that "[i]n the con-
struction of the statutes, words and phrases shall be construed according
to the commonly approved usage of the language . . . ." To ascertain the
commonly approved usage of a word, it is appropriate to look to the diction-
ary definition of the term. E.g., *State* v. *Payne,* 240 Conn. 766, 771, 695 A.2d
525 (1997).

attorneys general who are assigned to work with department personnel are fully consistent with this meaning of the term. See footnote 13 of this opinion. Moreover, we refuse to read into the statutory requirement that department employees shall "cooperate with . . . attorneys in [the] preparation of their cases"; General Statutes § 17a-47; a proviso prohibiting the commissioner or her designees from preparing and filing either neglect or termination petitions.[30] Such a proviso is

[30] The trial court observed that it "is aware that the present staff of attorneys assigned to child protection cases is . . . 'stretched to its limit.' But [the] court cannot sit back and permit the children of Connecticut to languish longer than necessary in foster care while over-burdened [department] social workers file faulty pleadings in the Superior Court. See *Juan F.* v. *O'Neill*, [United States District Court, Docket No. H-89-859 (D. Conn. January 7, 1991)]." *Juan F.* involved a class action that sought to address systemic deficiencies within the department of children and youth services, now the department of children of families. A comprehensive consent decree was approved in January, 1991, detailing procedures that the department was required to implement. *Juan F. by and through Lynch v. Weicker*, 37 F.3d 874, 876 (2d Cir. 1994), cert. denied, 515 U.S. 1142, 115 S. Ct. 2579, 132 L. Ed. 2d 829 (1995). Although the trial court in the present case did not assert that the practices it enjoined violated the terms of the federal consent decree, the amici curiae contend that they did. We disagree.

In order to implement the consent decree, the department was required to develop a manual for each section of the consent decree. Id. The manuals were adopted as court orders and incorporated in the consent decree in September, 1992. Id. One of the manuals provides in relevant part: "At least one . . . [assistant attorney general] shall be available to perform all mandated functions in a timely manner for the Regional Offices [of the department] five . . . days each week. The [assistant attorney general's] activity shall include but not be limited to the following:

"a. Assist workers in the preparation of court documents, and review documents prior to submission to achieve maximum effectiveness in court . . . ." *DCYS Regional Resource Group/Community Consultant Manual* (September 1, 1992) p. 7.

Aside from the contention of the amici curiae in the present case, we are not aware of any claim in any court in which it has been asserted that the commissioner's practice of having nonlawyers prepare, sign and file neglect and termination petitions violates the terms of the consent decree. And, although counsel for the amici curiae in the present case also is counsel to the plaintiff class in *Juan F.*, that counsel has identified no such case. Moreover, inasmuch as the federal district court has retained continuing jurisdiction over the consent decree, it is by no means clear that a state

neither implicit in the statutory language of § 17a-47 nor is its inclusion warranted for any other reason. We therefore agree with the commissioner that the legislature has expressly authorized the commissioner or her designees to prepare, sign and file petitions for the termination of parental rights.[31]

Furthermore, as we previously have indicated, Practice Book § 26-1 (*l*)[32] permits any person authorized by statute to execute termination and neglect petitions. Because we have concluded that the statutory scheme authorizes the commissioner and those acting on her behalf to prepare, sign and file termination petitions,

court would have jurisdiction to adjudicate such a claim. These considerations aside, we also are not persuaded that a requirement that assistant attorneys general provide *assistance* in the preparation of court documents, or that they review such documents before they are submitted to a court, reasonably may be read as a requirement that the attorneys, themselves, must prepare, sign and file such documents.

[31] We also note that the trial court, quoting from *In re Cassandra B.*, Superior Court, judicial district of Middlesex, Juvenile Matters, Child Protection Session at Middletown, Docket No. T11-CP96-000141 (November 4, 1997), another termination of parental rights case over which it had presided; see footnote 10 of this opinion; observed that, "prior to 1993, [the department] had, by statute, lawyers assigned to it . . . . It is understandable how [the department] could, at that time, file its own petitions. But, in 1993, by virtue of [Public Acts 1993, No.] 93-216, the [department's] lawyers were transferred to the office of the Attorney General, thus placing the Commissioner in the same position as all other department heads, i.e., that of relying on the Attorney General to perform her legal functions." We do not agree that P.A. 93-216 sheds any light on the question of whether our statutes authorize nonlawyers to file neglect and termination petitions on behalf of the department.

Public Act 93-216, entitled "An Act Concerning Technical and Minor Changes to DCYS Statutes," merely transferred, for administrative purposes, attorneys from the department to the office of the attorney general, primarily for the purpose of complying with the provisions of the consent decree. See 36 S. Proc., Pt. 10, 1993 Sess., p. 3424. The technical nature of the legislation belies any claim that it was intended to make any substantive change in the law. Accordingly, we reject the conclusion of the trial court that P.A. 93-216 has any bearing on the question of whether nonlawyer representatives of the commissioner may execute neglect and termination petitions.

[32] See footnotes 5 and 17 of this opinion.

the commissioner and her designees likewise are authorized to engage in such activities under Practice Book § 26-1 (*l*). We note, moreover, that the judicial branch has manifested its assent to the statutorily authorized activities by approving forms to be used for filing neglect and termination petitions that, although providing for the verification of signatures, contain no signature line for an attorney. Judicial Branch form JD-JM-40, Rev. 4-91 (termination petition); Judicial Branch form JD-JM-38, Rev. 11-88 (neglect petition).[33]

Therefore, even if it is assumed, arguendo, that the activities enjoined by the trial court constitute the practice of law, such activities do not violate Practice Book § 29 because they are not "unauthorized" within the meaning of that Practice Book section. Similarly, because the legislature also has expressly authorized the activities enjoined by the trial court, they do not violate the general proscription of § 51-88 against the practice of law by nonlawyers. It hardly would comport with logic to conclude that activities for which the legislature has made express statutory provision nevertheless violate a more general provision. "It is a well-settled principle of [statutory] construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." (Internal quotation marks omitted.) *State* v. *State Employees' Review Board*, 239 Conn. 638, 653, 687 A.2d 134 (1997). Thus, in light of the fact that both the legislative and judicial branches of our government have expressly authorized the activities enjoined by the trial court, they do not, ipso facto, violate either § 51-88 or Practice Book § 29. Accordingly, we conclude that the trial court improperly rendered judgment enjoining the commissioner or

---

[33] In other circumstances, the judiciary, by contrast, has developed forms that specifically require execution by an attorney. See, e.g., Practice Book Form 504.2 (petition for decree dissolving marriage after legal separation).

her designees from drafting, signing and filing termination petitions in the Superior Court.[34]

The portion of the judgment enjoining the commissioner from filing petitions for the termination of parental rights that have been prepared, signed and filed by persons not admitted to the practice of law is reversed.

In this opinion BORDEN, NORCOTT and KATZ, Js., concurred.

BORDEN, J., concurring. I fully agree with and join the majority opinion. I write separately only to address briefly the underlying question of whether the preparation and filing of petitions by social workers employed by and acting on behalf of the department of children and families (department) constitutes the practice of law. In my view, it does not.

In deciding whether certain conduct constitutes the practice of law, "the decisive question is whether the acts performed [are] such as are commonly understood to be the practice of law." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Patton*, 239 Conn. 251, 254, 683 A.2d 1359 (1996). As judges, we are entrusted with the obligation of articulating that common understanding on a case-by-case basis. Because the language of the definition offers little guidance as applied to any particular set of facts, we are required to give content to the definition in each case based on our knowledge of the history, tradition and

---

[34] We note, and as the commissioner acknowledged at oral argument, that the legislature, partly in response to new federal and state statutory mandates for more expedited filing of termination petitions; Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, § 103, 111 Stat. 2115, 2118–20; Public Acts 1998, No. 98-241, § 6 (a); that are expected to increase dramatically the number of such filings, recently appropriated funds to enable the department to hire approximately eight staff attorneys. See Special Acts 1998, No. 98-6. Although it is anticipated that the attorneys will assist in the review of neglect and termination petitions, the appropriation was not, in any respect, conditioned on the performance of such tasks.

experience of the practice of law—and what has commonly been considered not to be the practice of law—in this state.

Of course, lawyers routinely prepare and file petitions in court—in both routine and, as in this type of case, very significant matters. That does not mean, however, that whenever someone files such a petition on someone else's behalf[1]—whether routine or significant—that conduct invariably constitutes the practice of law. A distinction may be drawn between actions taken on behalf and at the behest of a public agency in furtherance of its statutory mandate, as in the present case, and comparable conduct undertaken by a private individual acting in a representative capacity. This distinction embodies a policy determination that is grounded in the principle of necessity: public agencies, and the individuals who serve as their chiefs, are compelled by statute to carry out certain tasks and fulfill certain statutory responsibilities that often have significant legal consequences, and that often involve interaction with the judicial system; in order to satisfy these statutory mandates, they must, of necessity, act through human agents, and those agents, of necessity, cannot all be attorneys. For me, this distinction and its underlying policy considerations, require the conclusion that the preparation and filing of a petition in the juvenile division of the Superior Court by a department social worker does not constitute the practice of law.

First, as the commissioner of the department informs us, "[b]etween September 1, 1994, [and] August 31, 1995, the commissioner or her designees executed and filed 5337 petitions for neglect, revocation or extension of commitments, and for termination of parental rights . . . . Although assistant attorneys general often review

---

[1] In the present case, for example, the social worker prepared and filed the petition on behalf of the commissioner of the department.

termination petitions before they are filed, some are not reviewed. Due to time constraints and pressing case loads, assistant attorneys general often are unable to review carefully termination petitions prior to their filing. Neglect petitions and motions for [orders of temporary custody] are rarely reviewed by an assistant attorney general prior to filing. However, subsequent to their filing, assistant attorneys general file appearances in the cases and, if necessary, file amended petitions. In this case, in fact, an assistant attorney general did precisely that." This history is persuasive evidence that the preparation and filing of such petitions without the intervention of an assistant attorney general has not been commonly understood to constitute the practice of law.

Second, our history, tradition and experience indicate that similar conduct by public officials acting pursuant to their statutory responsibilities does not constitute the practice of law. Probation officers have long and often prepared and filed petitions for violation of probation in criminal matters; see General Statutes § 53a-32;[2]

[2] General Statutes § 53a-32 provides: "Violation of probation or conditional discharge. Arrest. Hearing. Disposition. (a) At any time during the period of probation or conditional discharge, the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation or conditional discharge, or may issue a notice to appear to answer to a charge of such violation, which notice shall be personally served upon the defendant. Any such warrant shall authorize all officers named therein to return the defendant to the custody of the court or to any suitable detention facility designated by the court. Whenever a sexual offender, as defined in section 54-102s, has violated the conditions of his probation by failing to notify his probation officer of any change of his residence address, as required by said section, such probation officer may notify any police officer that such person has, in his judgment, violated the conditions of his probation and such notice shall be sufficient warrant for the police officer to arrest such person and return him to the custody of the court or to any suitable detention facility designated by the court. Any probation officer may arrest any defendant on probation without a warrant or may deputize any other officer with power to arrest to do so by giving him a written statement setting forth that the defendant has, in the judgment of the probation officer, violated the conditions of his probation. Such

and for delinquency in juvenile matters. See Practice Book § 26-1 (*l*).[3] The commissioner of social services has long and often prepared and filed petitions in the Probate Court for the appointment of conservators for the elderly; see General Statutes § 17b-456;[4] and municipal first selectmen and other municipal chief executive

written statement, delivered with the defendant by the arresting officer to the official in charge of any correctional center or other place of detention, shall be sufficient warrant for the detention of the defendant. After making such an arrest, such probation officer shall present to the detaining authorities a similar statement of the circumstances of violation. Provisions regarding release on bail of persons charged with a crime shall be applicable to any defendant arrested under the provisions of this section. Upon such arrest and detention, the probation officer shall immediately so notify the court or any judge thereof. Thereupon, or upon an arrest by warrant as herein provided, the court shall cause the defendant to be brought before it without unnecessary delay for a hearing on the violation charges. At such hearing the defendant shall be informed of the manner in which he is alleged to have violated the conditions of his probation or conditional discharge, shall be advised by the court that he has the right to retain counsel and, if indigent, shall be entitled to the services of the public defender, and shall have the right to cross-examine witnesses and to present evidence in his own behalf.

"(b) If such violation is established, the court may: (1) Continue the sentence of probation or conditional discharge; (2) modify or enlarge the conditions of probation or conditional discharge; (3) extend the period of probation or conditional discharge, provided the original period with any extensions shall not exceed the periods authorized by section 53a-29; or (4) revoke the sentence of probation or conditional discharge. If such sentence is revoked, the court shall require the defendant to serve the sentence imposed or impose any lesser sentence. No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by the introduction of reliable and probative evidence and by a preponderance of the evidence."

[3] Practice Book § 26-1 (*l*) provides: " 'Petition' means a formal pleading, executed under oath alleging that the respondent is within the court's authority to adjudicate the matter which is the subject of the petition by reason of cited statutory provisions and seeking a disposition. Except for a petition for erasure of record, such petitions invoke a judicial hearing and shall be executed by any one of the parties authorized to do so by statute, provided a delinquency petition may be executed by either a probation officer or juvenile prosecutor."

[4] General Statutes § 17b-456 provides: "Appointment of conservator for elderly person lacking capacity to consent to protective services. (a) If the Commissioner of Social Services finds that an elderly person is being abused,

officers have long and often filed petitions in the Probate Court for the necessary psychiatric commitment of individuals who are dangerous to themselves or others. See General Statutes § 17a-497 (a).[5] Police officers have long and often prepared and presented to judges

neglected, exploited or abandoned and lacks capacity to consent to reasonable and necessary protective services, he may petition the Probate Court for appointment of a conservator of the elderly person pursuant to the provisions of sections 45a-644 to 45a-662, inclusive, in order to obtain such consent.

"(b) Such elderly person or the individual, agency or organization designated to be responsible for the personal welfare of the elderly person shall have the right to bring a motion in the cause for review of the Probate Court's determination regarding the elderly person's capacity or an order issued pursuant to sections 17b-450 to 17b-461, inclusive.

"(c) The Probate Court may appoint, if it deems appropriate, the Commissioner of Social Services to be the conservator of the person of such elderly person.

"(d) In any proceeding in Probate Court pursuant to provisions of sections 17b-450 to 17b-461, inclusive, the Probate Court shall appoint an attorney to represent the elderly person if he is without other legal representation."

[5] General Statutes § 17a-497 provides in relevant part: "Commitment jurisdiction. Application. Appointment of three-judge court. (a) The jurisdiction of the commitment of a person with psychiatric disabilities to a hospital for psychiatric disabilities shall be vested in the court of probate for the district in which such person resides or, when his or her place of residence is out of the state or unknown, in which he or she may be at the time of filing the application, except in cases where it is otherwise expressly provided by law. In any case in which the person is hospitalized in accordance with the provisions of sections 17a-498, 17a-502 or 17a-506, and an application for the commitment of such person is filed in accordance with the provisions of said sections, the jurisdiction shall be vested in the court of probate for the district in which the hospital where such person is a patient is located. In the event that an application has been previously filed in another probate court with respect to the same confinement, no further action shall be taken on such prior application. If the respondent is confined to a hospital, notwithstanding the provisions of section 45a-7, the judge of probate from the district where the application was filed shall hold the hearing on such commitment at the hospital where such person is confined, if in the opinion of at least one of the physicians appointed by the court to examine him it would be detrimental to the health and welfare of the respondent to travel to the court of probate where the application was filed or if it could be dangerous to the respondent or others for him to travel to such court. Courts of probate shall exercise such jurisdiction only upon written application alleging in substance that such person has psychiatric disabilities and is

applications for search warrants; see General Statutes § 54-33a;[6] and have instituted criminal proceedings through the preparation and issuance of misdemeanor summonses. See General Statutes § 54-1h.[7] Our history, tradition and experience are persuasive evidence that

dangerous to himself or herself or others or gravely disabled. Such application may be made by any person and, if any person with psychiatric disabilities is at large and dangerous to the community, the first selectman or chief executive officer of the town in which he or she resides or in which he or she is at large shall make such application. . . ."

[6] General Statutes § 54-33a provides: "Issuance of search warrant. (a) As used in sections 54-33a to 54-33g, inclusive, 'property' includes, without limitation, documents, books, papers, films, recordings and any other tangible thing.

"(b) Upon complaint on oath by any state's attorney or assistant state's attorney or by any two credible persons, to any judge of the Superior Court, that he or they have probable cause to believe that any property (1) possessed, controlled, designed or intended for use or which is or has been used or which may be used as the means of committing any criminal offense; or (2) which was stolen or embezzled; or (3) which constitutes evidence of an offense, or that a particular person participated in the commission of an offense, is within or upon any place, thing or person, such judge, except as provided in section 54-33j, may issue a warrant commanding a proper officer to enter into or upon such place or thing, search the same or the person and take into his custody all such property named in the warrant.

"(c) A warrant may issue only on affidavit sworn to by the complainant or complainants before the judge and establishing the grounds for issuing the warrant, which affidavit shall be part of the arrest file. If the judge is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person, place or thing to be searched. The warrant shall be directed to any police officer or a regularly organized police department or any state policeman or to a conservation officer, special conservation officer or patrolman acting pursuant to section 26-6. It shall state the grounds or probable cause for its issuance and it shall command the officer to search within a reasonable time the person, place or thing named, for the property specified."

[7] General Statutes § 54-1h provides: "Arrest by complaint and summons for commission of misdemeanor. Any person who has been arrested with or without a warrant for commission of a misdemeanor, or for an offense the penalty for which is imprisonment for not more than one year or a fine of not more than one thousand dollars, or both, may, in the discretion of the arresting officer, be issued a written complaint and summons and be released on his written promise to appear on a date and time specified. If any person so arrested and summoned fails to appear for trial at the place

these officials have not been commonly understood to have been engaging in the practice of law, and the conduct in question in the present case is no more the practice of law than the conduct of these public officials.

BERDON, J., concurring. I concur in the result because the practice of allowing petitions for the termination of parental rights to be filed by social workers of the department of children and families (department) is authorized by statute; General Statutes § 17a-112; and our rules of practice; Practice Book (1998 Rev.) § 26-1 (*l*), formerly § 1023.1 (*l*).[1] I write separately because I am concerned about three matters.

First, petitions to terminate parental rights involve a "natural parent's desire for and right to the companionship, care, custody, and management of his or her children . . . an interest far more precious than any property right." (Internal quotation marks omitted.) *Santosky* v. *Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Valerie D.*, 223 Conn. 492, 513, 613 A.2d 748 (1992). This right "encompasses the reciprocal rights of both parent and children." (Internal quotation marks omitted.) *Pamela B.* v. *Ment*, 244 Conn. 296, 310, 709 A.2d 1089 (1998). When the state decides to initiate a termination proceeding, "it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky* v. *Kramer*, supra, 759. "[F]ew consequences of judicial action are so grave as the severance of natural family ties." (Internal quotation marks omitted.) *M. L. B.* v. *S. L. J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996). Therefore, a

and time so specified, or on any court date thereafter, a warrant for his rearrest or a capias shall be issued and he shall also be subject to the provisions of section 53a-173."

[1] See footnotes 1, 3 and 5 of the majority opinion for the relevant text of these provisions.

child's interest in termination proceedings being con-
ducted in a legal and timely manner, and in a manner
that is error-reducing is a "commanding one." *Santosky*
v. *Kramer*, supra, 759. Unfortunately, by allowing
department social workers, untrained in the law, to
initiate termination proceedings before our juvenile
courts, when it should be done by attorneys,[2] could
and has resulted in delays that may seriously harm the
children—children who already have been victimized.
It has also resulted in the bringing of petitions that
patently have no legal basis. Indeed, Judge Foley, in
his trial court memorandum of decision, identified
examples of the serious problems caused by the filing
of improper termination petitions by department social
workers.[3] The state should and must address these
concerns.

The second matter that I am concerned about is that
the state's practice of allowing social workers to file
petitions violates, at least, the spirit of the consent
decree entered into by the department as a result of a
class action suit brought in 1989 in the United States
District Court for the District of Connecticut in order
to remedy systemic deficiencies in the department. See

[2] In his memorandum of decision, Judge Foley concluded that a "person drafting the petition to terminate parental rights" must "exercise [a] high degree of legal skill and great capacity for adaptation to difficult and complex situations." (Internal quotation marks omitted.)

[3] Judge Foley found that the filing of mistake filled and improper petitions by department social workers "are regularly occurring with great frequency in juvenile court proceedings throughout the state. They have led to public harm in that: (a) they have delayed the proceedings; (b) they have put the respondents, and the state, to unnecessary expense for lawyers, publication expenses and related costs of service; (c) they have wasted available court time and staff resources; (d) [t]he time invested by [social workers] in preparing inadequate legal cases is time that could far better be spent improving their performance of the social service vocation for which they are trained . . . and (e) they have needlessly extended the already unacceptable time frame for permanent placement and adoption of children." (Citation omitted; internal quotation marks omitted.)

*Juan F.* v. *O'Neill,* United States District Court, Docket No. H-89-859 (D. Conn. January 7, 1991). The *Juan F.* consent decree required the state to develop department policy manuals that would ensure a reduction in operational errors in filing and processing petitions that could rise to the level of the deprivation of a party's fundamental constitutional rights. One such manual provides in relevant part: "At least one (1) [assistant attorney general] shall be available to perform all mandated functions in a timely manner for the Regional Offices five (5) days each week. The [assistant attorney general's] activity shall include but not be limited to the following: a. Assist workers in the preparation of court documents, and review documents prior to submission to achieve maximum effectiveness in court . . . ." Regional Resource Group/Community Consultant Manual (State of Connecticut 1992) p. 7. That obviously has not been done.

Third, "[t]he current caseload of the Attorney General's Office does not allow for sufficient time [for attorneys to meet with caseworkers] to process child protective cases"; State of Connecticut Court Improvement Project Report (Edmund S. Muskie Institute, University of Southern Maine, 1996) p. 72;[4] and, according to Kristine Ragaglia, commissioner of the department, in a letter dated March 10, 1998, addressed to Senator Toni N. Harp and Representative John W. Thompson, "the number of Termination of Parental Rights . . . petitions filed in court are anticipated to increase from the current level of about 770 to 1000 in [fiscal year 1999]." If the state fails to address these problems, it is not unreasonable to predict that the state's practice of

[4] "The State of Connecticut Court Improvement Project Report was the result of the federal requirement for a comprehensive assessment of the performance of state courts with respect to their adjudication of allegedly abused children." *Pamela B.* v. *Ment,* supra, 244 Conn. 338 n.7 (*Berdon, J.,* concurring).

allowing department social workers to file termination petitions may reach a point when it becomes error-ridden instead of error-reducing and, therefore, violates the constitutional rights of the children and their natural parents. At that point, the issue of whether the filing of a petition is permitted by statute or by rules of this court, and whether it constitutes the practice of law will be irrelevant; the federal and state constitutions would trump any state authority.

With some hesitation and with great concern, I concur in the result.