Memorandum of Decision
On November 12, 1998, the Department of Children and Families (DCF) filed petitions alleging that Gary P., Jr., Katie P., and Michael P. were neglected in that the parents, Gary P., Sr. and Sophie P., permitted the children to live under conditions, circumstances or associations injurious to the children's well-being.[2] A consolidated trial of these petitions took place on May 4 and 5, 1999. For the reasons stated below, the court adjudicates the children neglected and places the children in the custody of the mother under the protective supervision of DCF.
FACTS
The court finds the following facts and credits the following evidence. The father, who is now forty-four, and the mother, who is now forty, were married in 1985. Over the course of their relationship, which began before their marriage, the couple produced three children: Gary, who will be eighteen this CT Page 6661 September, Katie, who is almost twelve, and Michael, who is almost ten. The couple divorced in 1996. The dissolution order provided for joint legal custody of the children with primary physical residence with the mother.
Around the time of the divorce, the mother began drinking. In April, 1997, police arrested her for driving under the influence. Apparently, the court placed the mother in an alcohol education program. The mother began several other treatment programs, but generally dropped out and relapsed into drinking.
On March 6, 1998, the mother appeared at her younger children's elementary school in an inebriated state, demanding, in loud and abusive language, to see her children. The mother eventually drove off, running a stop sign where children were crossing the road. She was again arrested for driving under the influence, although there is no record of any conviction.[3]
After this incident, the mother went into an inpatient treatment facility. She participated in a partial hospitalization program and then was discharged. The mother maintained sobriety for several months and obtained a job.
In August, 1998, the mother reported that she was no longer employed and that she was tired of her continuing outpatient treatment. In October, 1998, the mother began drinking again. The mother refused referrals to inpatient facilities, failed to attend counseling sessions at a family resources agency, and was in denial of her problem. After drinking, the mother would often fall asleep at home, leaving the maternal grandmother, Sophie N., who lived downstairs, to take care of the children.
Since January or February, 1999, the mother has been sober. By all accounts, the mother has excellent parenting skills when not drinking. During this time, the mother has regularly attended and participated in Alcoholics Anonymous (AA) meetings. Also during this time, the mother has been working as a phlebotomist in a doctor's office. The maternal grandmother has continued to help out by, for example, seeing the younger children off and meeting them at the school bus stop. The maternal grandmother concedes that she can no longer take over completely for the mother.
The father has been regularly employed and compliant with DCF. He is a recovering alcoholic who has been sober for over CT Page 6662 five years. He has exercised regular visitation with his children since the divorce but, apparently because he works at night, has not been especially active with them during the daytime visits. In early 1998, he filed a petition in the Family Division of the Superior Court to obtain primary custody of the children, but has not lately pursued the motion.
The children have always been well fed, properly housed, adequately clothed, and in good health. Michael has always been an outstanding student. In the prior two school years, however, Michael and Katie were absent more than the number of days that the school tolerates. During the prior school year, Katie's grades were below expectations. In the present school year, their attendance record, and Katie's grades, have improved.
The primary psychological parent for all three children is the mother. Gary has lived with his father at times and, as a seventeen and one-half year old, tends to come and go rather freely. Michael has been visibly upset on several occasions about his mother's drinking and, under some circumstances, has expressed a desire to live with the father. Of the three children, Katie is the most attached to and protective of her mother.
ADJUDICATION
The statutory subsection relied upon by DCF in the neglect petitions provides that a child or youth may be found "neglected" who "is being permitted to live under conditions, circumstances, or associations injurious to his well-being." General Statutes § 46b-120(8)(C). DCF has the burden of proving this ground by a fair preponderance of the evidence. Practice Book § 33-12. In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. Practice Book § 33-3(a). The adjudicatory date in this case is thus November 12, 1998.
The mother and the minor children argue that the "injurious to well-being" ground requires proof of tangible harm to the children and that there is no such proof here. Although there are no appellate decisions interpreting this subsection, some indication of its meaning comes from a review of the statute as a whole. The adjoining subsections define "neglected" to include a child who "is being denied proper care and attention, physically, educationally, emotionally or morally," General Statutes CT Page 6663 § 46b-120(8)(B), and a child who "has been abused." §46b-120(8)(B). These subsections connote specific types of harm to a child. Given that a court must construe a statute so that no clause, sentence, or word is considered superfluous, Ferrigno v.Cromwell Development Assoc., 244 Conn. 189, 196, 708 A.2d 1371
(1998), it follows that the "injurious to well-being" subsection must mean something different than the specific types of harm addressed in the adjoining subsections.
In interpreting the language of a statute, courts should usually give words their plain and ordinary meaning, including the meaning found in a dictionary. See In re Darlene C.,247 Conn. 1, 10-11 n. 29, 717 A.2d 1242 (1998). The ordinary meaning of "injurious" means "injuring or likely to cause. . . ." Webster's New World Dictionary (emphasis added). This definition makes sense because, in ordinary parlance, one would clearly consider something that is likely to cause harm, such as a loaded gun lying on a kitchen table, as "injurious to [the] well-being" of a child. Indeed, our law attaches severe consequences to parental acts that are likely to cause harm to children, even if they have not caused actual harm. See General Statutes § 53-21
(making it a felony when any person wilfully or unlawfully causes or permits any child to be placed in such a situation that "the health of such child is likely to be injured or the morals of such child are likely to be impaired. . . ."); § 46b-129(b)(1) (authorizing DCF to take temporary custody of a child in "immediate physical danger from his surroundings."). The court therefore construes "injurious to [the] well-being" of a child to include conditions likely to cause harm.
While it would have been helpful for DCF to have presented qualified testimony on why an alcoholic parent is injurious to the well-being of a child, the notion that an alcoholic parent places a child at risk seems almost self-evident. An alcoholic parent will be inattentive, physically or emotionally unavailable, erratic, and possibly dangerous. Certainly a parent who drinks excessively or is intoxicated in the presence of her children sets the wrong example for her children to follow.
In the present case, while there is scant evidence of actual harm to the children, there is considerable evidence that the mother's alcoholism was likely to cause them harm. The fact that the mother went to sleep in the daytime after drinking means that she was simply not there to attend to their needs, including any urgent ones. Of even more concern is the fact that the mother CT Page 6664 would drive after drinking. Doing so posed an immediate physical danger to herself and, if they were passengers, to her children. For all these reasons, the court finds that DCF has proven by a fair preponderance of the evidence that the children were neglected in that they were "permitted to live under conditions, circumstances, or associations injurious to [their] well-being." General Statutes § 46b-120(8)(C).
DISPOSITION
In the dispositional phase, the court may consider events occurring through the close of the evidentiary hearing. Practice Book § 33-5. DCF retains the burden of proof by a fair preponderance of the evidence based on the best interest of the child. Practice Book § 33-12.[4]
DCF seeks to place the children in the father's custody under DCF protective supervision. It relies in part on the February 16, 1999 report and subsequent testimony of the Family Relations Counselor who mediated the divorce and who recommended that the court transfer primary physical custody of the children to the father.
As the counselor testified, however, the children have a strong bond with their mother and regard her as their psychological parent. Indeed the report acknowledges that "the P[.] children would get along equally well in either environment," but, assuming the mother were sober, "living with the father is not the best option for them since their primary psychological parental bonds are still with the mother."
The mother has now remained sober for three months. She is an excellent mother when sober. She attends AA and has a steady job. The younger children are doing well in school. The court finds that her home has stabilized to the point at which she can and should retain custody of the children.
A strict regime of protective supervision is still necessary. Given the mother's history of alcoholism, a significant risk of relapse exists. The mother needs a substance abuse evaluation and follow-up treatment. The fact that the grandmother feels more limited in the help that she can provide means that DCF will have to provide supervision to insure the children's well-being. The children may need counseling as well. The court will separately enter an appropriate set of specific steps for the parties to CT Page 6665 take.[5]
CONCLUSION
For the foregoing reasons, the court adjudicates the children neglected and places them in the mother's custody under the protective supervision of DCF for a period of six months.
It is so ordered.
Carl J. Schuman Judge, Superior Court
[2] The court will refer to Gary P., Jr. as "Gary" and to Gary P., Sr. as "the father."
[3] The school principal reported one other incident in which the mother came to school yelling and screaming.
[4] Although the neglect statute and related Practice Book rules do not specifically state that the standard in deciding the appropriate disposition is the best interest of the child, the statute and rules explicitly make the best interest standard applicable to motions to revoke commitment or modify disposition. See General Statutes § 46b-129(m); Practice Book §§ 33-11
and 33-11. Logically, if the best interest standard applies to motions to revoke or modify dispositions, then that standard applies to the original imposition of disposition. See generallyIn re Juvenile Appeal (83-CD), 189 Conn. 276, 285, 455 A.2d 1313
(1983).
[5] DCF proposes as a specific step that, in the event the mother has a relapse, custody of the children should go to the father without further court order. The court agrees with this proposal because it will-protect the children and because placement with the father would be preferable to nonrelative foster care.