# IN RE LINDSEY P.[1]

Superior Court
Juvenile Matters

Memorandum filed March 10, 2004

LOPEZ, J. This matter came to the Child Protection Session of the Superior Court on June 12, 2003, for a contested hearing on an order of temporary custody. An order of temporary custody had been issued ex parte by the court, *Harlestan, J.,* on May 29, 2003.

Prior to commencing the present contested hearing, the parties informed the court that they had reached an agreement. The agreement called for the court to vacate the order of temporary custody and return Lindsey P. to her father, Gary H., on that day. The agreement further called for Gary H. to enter a plea of nolo contendere to the underlying neglect petition. The court would

---

[1] Thus entitled in accordance with the spirit and intent of General Statutes §§ 46-124 and 45a-715 (b) and Practice Book § 35.5.

then enter a dispositional order of nine months of protective supervision subject to certain specific steps.

Having examined the affidavit filed by department of children and families (department) social worker Christina Wagner-Morella in support of the order of temporary custody, the court asked for further clarification on the extent of the alleged injuries sustained by Lindsey P. before accepting the agreement. The affidavit stated that Lindsey P., a little girl four years of age, had sustained a fractured clavicle as a result of physical abuse inflicted on her by Gary H.

The affidavit further stated that Lindsey P.'s mother, Ann Marie P., had told the department that Gary H. "has a history of 'beating his children.' " Ann Marie P. also alleged that Gary H. " 'beat' his two adult daughters when they were teenagers." The social worker further represented that she had confirmed two substantiations of child protection issues regarding Gary H.'s daughters with the Massachusetts department of social services. Additionally, Wagner-Morella averred: "On March 20, 2003, Lindsey P. was examined at the . . . Children's Center by . . . Frederick Berrien [a physician]. It was concluded that Lindsey [P.] sustained a displaced fracture at the distal third of the right clavicle. The injury is consistent with Father throwing [the] child into a wall."

As a result of this, the social worker represented to the court that the department believed that Lindsey P. was in immediate physical danger from her surroundings and that continuation in her home was contrary to her welfare.

Berrien, who was present in the courthouse in anticipation of the contested hearing, was asked to testify before the court accepted the proposed agreement. He testified, consistent with his report, that he believed that the "incident appears accidental," although he

questioned the appropriateness of Gary H.'s response to his daughter's act of spilling a drink. Berrien also stated that contrary to the statement in the social worker's affidavit, he had never conducted a physical examination of Lindsey P. In fact, his report does not state that he ever physically examined the child.

The affidavit also did not refer to Berrien's language that the "incident appeared accidental," nor did it refer to his recommendation that Gary H. be "enrolled in parenting classes which focus on the normal development of [children] and appropriate responses to their behavior."

At the end of a lengthy hearing on June 12, 2003, the court accepted the proposed agreement, vacated the order of temporary custody, adjudicated Lindsey P. a neglected child and entered a dispositional order of nine months of protective supervision. Pursuant to General Statutes § 46b-129, the court entered specific steps. The court also ordered a psychological evaluation of the father.

In addition, the court ordered the department to show cause why it should not be held in contempt for its failure to provide accurate information to the court at the time of filing an application for an ex parte order of temporary custody. The inaccuracies included statements that Berrien had examined Lindsey P. immediately after the accident when, in fact, he had only reviewed the medical reports provided to him by the department. The inaccuracies also included omitting that the physician had concluded that the incident appeared accidental. Furthermore, the affidavit omitted any mention of the statements made by the reporter of the incident, Felicia Wilion, Lindsey P.'s pediatrician. The pediatrician's statements concluded that this particular "type of fracture is very common and not neces-

sarily a sign of force because it can occur if a child falls out of bed."

The court continued the matter to July 10, 2003, to allow the department an opportunity to prepare to show cause why it should not be held in contempt. Hearings were held on July 10, August 7 and September 5, 2003, during which the court heard the testimony of Wagner-Morella, the author of the affidavit. The court also heard the testimony of Michael C. Williams, the regional administrator of the department, northern region. In addition, the court was provided with documentary evidence.

At the conclusion of the hearing, the court provided the parties with an opportunity to brief the issues presented in the case, namely, whether the department provided misleading and inaccurate information on the affidavit of one of its social workers and if so, should it be held in contempt for such conduct. The final briefs were due and received on November 22, 2003.

A thorough examination of the facts in the present case reveals an appalling combination of arrogance and ineptitude, which culminated in the traumatic removal of Lindsey P. from her home based on evidence that was inaccurate, misleading and incomplete. The facts of this unwarranted intrusion are very disturbing.

I

FACTS

Lindsey P. is a minor child who was born on October 27, 1998, to Gary H. and Ann Marie P. Due to a series of debilitating medical and emotional issues, Ann Marie P. had not been the custodial parent of Lindsey P. since June 14, 2000. Lindsey P. was only one and one-half years old at the time. On that day, Gary H. and Ann Marie P. reached an agreement in family court, stating that, as parents, they would share joint legal custody

of their daughter. Lindsey P.'s primary residence, however, was to be with her father.

On March 18, 2003, the department received a hotline referral from Lindsey P.'s pediatrician. The pediatrician stated that "Lindsey [P.] . . . has a fractured right clavicle from her father 'throwing' her. . . . Caller states this type of fracture is very common and not necessarily a sign of force because it can occur if a child falls out of bed."

Pursuant to department protocol and state statutes, an investigation into the allegations commenced within twenty-four hours. Beverly Bosse was assigned to the case. Bosse spoke to the pediatrician on March 20, 2003. According to the social worker, the physician stated that Lindsey P. "was very difficult to understand; said her facts were a little vague."

The police department also investigated the allegations, and no charges were filed against Gary H. The police determined that the incident was an accident. On March 20, 2003, a police report was prepared indicating that the file would be closed.

Bosse completed her very detailed investigation into the allegations on March 26, 2003. Her recommendations were as follows: "1. Ensure father follows through with all medical appointments for his [daughter]; 2. Ensure father cooperates with a substance abuse evaluation and anger management counseling through Hockanum [Valley]; 3. Ensure that father participates with parenting classes through Kidsafe, [Inc.]; 4. Ensure father follows through with educational needs for his daughter to address her speech and hearing [difficulties; and] 5. Ensure father refrains from all forms of physical punishment when disciplining his daughter.

"Neglect Petitions will be filed by this worker on behalf of this four-year-old child."

On April 2, 2003, twelve days after the investigation, the case was transferred from investigative social worker Bosse to treatment social worker Wagner-Morella. According to the running narrative document, on April 3, 2003, Wagner-Morella went to the home of Gary H. for an announced home visit. Her notes on the running narrative indicate that Gary H. informed her that he had already completed the substance abuse evaluation and urine screen as recommended by Bosse. He further informed Wagner-Morella that no substance abuse treatment was recommended. He also stated that he had been sober for eight years and was attending Alcoholics Anonymous. He also informed her that he had signed up for a parenting education-support group. At the end of the visit, Wagner-Morella reviewed the expectations for case closing with Gary H. According to the case narrative, three items were listed: "1. Father was to complete parenting classes and to demonstrate maintained non-physical discipline and age appropriate expectations; 2. No new referrals; [and] 3. Consistently meet the basic and medical needs of the child."

Before leaving, Wagner-Morella scheduled the next home visit for April 9, 2003.

On April 9, 2003, the social worker attempted to meet with the father, but no one answered the door. The next time that she met with Gary H. was on April 14, 2003. During this visit, she was told by Gary H. that he had been unable to start the parenting classes. She called the recommended provider of the parenting classes during the home visit and was told that he would be able to start the next available class; however, no date was given.

On the day following the home visit, April 15, 2003, the social worker confirmed that in fact, Gary H. did not need substance abuse treatment. On this day, the

social worker also received a telephone call from Lindsey P.'s pediatrician stating that Lindsey P. had been seen for follow up visits on March 25 and April 12, 2003, and that the physician had no concerns. Wagner-Morella also learned that Lindsey P. was up to date medically and that her next wellness appointment was on October 3, 2003.

While Wagner-Morella was engaged in providing case management services to this family, Bosse filed a neglect petition on behalf of the commissioner of children and families (commissioner) with the Superior Court, alleging that Lindsey P. was a neglected and abused child. The petition, filed on April 14, 2003, alleged that Lindsey P. was a neglected child in that she was allowed to live under conditions injurious to her well-being and that she was being denied proper care and attention. The petition also alleged that Lindsey P. was an abused child in that she had been abused and had injuries inflicted on her by other than accidental means. The addendum to the petition listed six jurisdictional facts: "[1] Father has failed to provide a safe, stable and nurturing environment for said child. [2] Mother has failed to provide a safe stable and nurturing environment for said child. [3] Father physically abused said child. Child suffered a fractured clavicle. [4] Father did not seek medical attention for said child. [5] Father has unresolved anger management issues that negatively impact his ability to provide appropriate care to said child. [6] Mother has unresolved mental health issues that negatively impact her ability to provide appropriate care to said child."

The petition also included a summary of facts to substantiate the allegations of neglect.

On May 15, 2003, the plea date of the neglect petition, Gary H. and Ann Marie P. appeared in court. Wagner-Morella appeared on behalf of the commissioner. According to the court action sheet contained in the

court file, of which this court takes judicial notice, this hearing was uneventful and routine. No special requests were made of the court, nor were any concerns discussed. The respondent parents entered denials and were provided with court-appointed counsel. The case was continued to June 10, 2003, for purposes of a case status conference in accordance with the provisions of Practice Book § 35a-2.

The social worker's notes of May 15, 2003, on the running narrative indicate that Gary H. appeared alert and sober on the court date. It was also noted that he had not yet started services because the service providers had not called him with starting dates for the services. No other recommendations were made.

On May 29, 2003, two weeks after the parties' court appearance on the plea date, Wagner-Morella filed an ex parte application to the court for an order of temporary custody. Pursuant to § 46b-129 (b) and Practice Book § 33a-6, Wagner-Morella filed her "verified affirmations of fact" in a sworn affidavit together with the application. The affidavit in question was "subscribed and sworn" to before Regina Munson, a notary public, on May 29, 2003.

In her five page affidavit, Wagner-Morella averred that she was assigned the case on April 2, 2003. Since being assigned the case, Wagner-Morella stated, she had had two interviews with Gary H. The first interview occurred on April 14, 2003, in Gary H.'s home. During this visit, she had the opportunity to observe the interaction between father and daughter.

In addition, the affidavit stated that Wagner-Morella and Gary H. discussed problems the father had experienced in the past with child protective services in Massachusetts. Gary H. also informed Wagner-Morella that he used to drink to the point of intoxication but that he has been in recovery for the last eight years. Gary

H. also informed Wagner-Morella that earlier in his life, when his two adult daughters were children and he was still drinking, he would leave the children alone to go out and buy alcohol.

Wagner-Morella's affidavit also includes information that on April 24, 2003, Lindsey P.'s Head Start program (Head Start) teacher reported to Bosse, the social worker investigating the referral, that she overheard Lindsey P. tell her little friends in Head Start that her "daddy pushed her out of a car." When the Head Start teacher questioned Lindsey P. on the statement, Lindsey P. denied that she ever made the statement and remarked, "I was just pretending."

The affidavit continues with a description of the social worker's subsequent visit to the home of Gary H. and Lindsey P. That visit took place on April 30, 2003. During this visit, the social worker questioned Lindsey P. on the statements made by Lindsey P. during her Head Start classes. Lindsey P. once again denied ever making statements regarding being pushed out of a car by her father.

The affidavit also referred to the incident in which Lindsey P. had sustained the fractured clavicle. This is the incident that had occurred two and one-half months before the application for the order of temporary custody on March 18, 2003, and had been thoroughly investigated by social worker Bosse at the time of the incident.

Relying on the statements contained in the affidavit, the court, *Harleston, J.*, issued the ex parte order of temporary custody. In ordering that the temporary custody of Lindsey P. be given to the department, the court removed Lindsey P. from her home and placed her in foster care—traumatic and life-changing event for anyone, especially a little girl four years of age, who

was already dealing with the stress of her mother's illness and the separation of her parents.

According to the running narrative document, at the time of the removal, the social worker "went to the home of Gary [H.] accompanied by two [p]olice [o]fficers. Lindsey [P.] was removed from her home and brought back to the [department's] office. Lindsey [P.] ate dinner and spoke with her mother on the telephone. Lindsey [P.] was then transported to an emergency foster home.

"At 6:30 p.m., mother called the Hotline, crying hysterically [and] stating that her daughter's father, Gary [H.], just called her telling her that Lindsey [P.] was just removed from his home and placed in foster care. . . . Mother stated that she attended a meeting this [morning] with [the department] and was under the impression that her daughter would not be removed until the next [c]ourt date, and that she may be a resource. Mother continued to cry hysterically wanting information and to know that her daughter was [okay]."

After issuing the order of temporary custody, the court ordered the parents to be served with notice to appear in court for a preliminary hearing on the order of temporary custody on June 6, 2003, at 9:30 in the morning. This family was informed by the court that it would have to wait eight days before knowing the details concerning their daughter's placement in the home of a stranger.

On June 6, 2003, the parties appeared in court. During the hearing, Judge Harleston was provided with a copy of the police report of March 20, 2003. This is the report that was generated as a result of the investigation into the injuries sustained by Lindsey P. on March 18, 2003. The police report indicated that no charges would be filed and that the file would be closed. The police had determined that the incident was accidental.

The June 6, 2003 court action sheet contained in the court's file indicates that counsel for Gary H. asked the court to vacate the order of temporary custody with a show cause hearing "on the basis of the police report not being submitted to the [c]ourt by [the department] with the [order of temporary custody] request on [May 29, 2003]."

Judge Harleston agreed to issue an order to show cause against the department to determine if "the department should be held in contempt for not including the police report or the information contained in the police report with the [order of temporary custody] submitted to the court on [May 29, 2003]." The matter was scheduled for June 9, 2003. Judge Harleston did not vacate the order of temporary custody; rather, she sustained it without prejudice and referred that portion of the case to the Child Protection Session in Middletown for a hearing to be held on June 12, 2003.

At the show cause hearing before Judge Harleston, held on June 9, Wagner-Morella testified that the omission of the police report on the application for the order of temporary custody was unintentional. The court accepted that the failure to include the police report with the ex parte order of temporary custody application was unintentional and found that the department had shown cause why it should not be held in contempt. The case was then continued to June 12, 2003, for the contested order of temporary custody hearing at the Child Protection Session. As stated in part I, the procedural history section of this memorandum of decision, the case was continued for hearings on the order to show cause.

On July 10, 2003, the court heard the testimony of Wagner-Morella, the author of the affidavit. The extent of her direct testimony centered on providing the court with the reasons that she wrote in her affidavit that Berrien had examined Lindsey P., when in fact, he never did and his report never said that he did.

"Q. At the time that you wrote that affidavit on or about May 29, 2003, what was your understanding as to Dr. Berrien's involvement with Lindsey P.?

"A. It was my understanding that Dr. Berrien had done a consult with an evaluation of Lindsey P. . . .

"Q. What has been your experience with [the] St. Francis Aetna Foundation?

"A. In dealing with the program that deals with child abuse and neglect, it's my experience that the children are always brought to see the doctor.

"Q. Now, did you use this document at all to rely upon in making your affidavit?

"A. Yes. . . .

"Q. And you were here when he took the [witness] stand and stated that he had not seen the child, he had just reviewed [the] records?

"A. Yes.

"Q. Had you been aware of that prior to his testimony?

"A. No.

"Q. When you drafted your affidavit, were you in any way trying to purposely mislead this court or any other court regarding this case?

"A. No.

"Q. Did you make a mistake?

"A. Apparently so."

During cross-examination, Wagner-Morella was asked the following questions:

"Q. Your affidavit states that Dr. Berrien stated that he saw the child and that the injuries were consistent, according to Dr. Berrien, with a child being thrown into a wall.

"A. Yes.

"Q. Is that correct? What was just entered into evidence doesn't say that at all. It says that this child—that what happened was accidental. Where did you come up with that conclusion of Dr. Berrien?

"A. Dr. Berrien, in his history, talks about the history given and the [words] used were 'thrown into a wall.'

"Q. And again, his conclusion is the child was hurt accidentally. What you're referring to is a history given to him by [the department]; isn't that correct? Please tell me in there, point out where Dr. Berrien said this injury happened from a child being thrown into a wall.

"A. There is no direct statement to my recollection of him saying directly that. However, he did state in here that it's consistent with the history given and the history given was that she was thrown into a wall.

"Q. Have you read this report?

"A. I have.

"Q. Recently? Where in the report, since you've just testified to that, where exactly are you referring to in that report? It's not in there.

"A. 'The child states that she hit the wall.'

"Q. Where does that statement come from? . . .

"A. It says in the first statement, 'Report to [the department] on [March 18, 2003] by Felicia [Wilion], M.D. of Bloomfield that Lindsey [P.] had a fractured clavicle and that the child reported that her father threw her. . . . According to [the department] and . . . [the] police department investigation on [March 17], the child spilled a drink from a glass and father became angry and grabbed her by the left wrist with his left hand pushing her away. Father reported that she fell on the floor; however, child says that [she] hit a wall.

She did complain of the pain.' And it goes on to that effect. But on the last sentence of that paragraph, it says, 'During the evaluation, she was asked how this happened [and] she replied that her father threw her.' "

As the questioning continued, Wagner-Morella was asked to comment directly on Wilion's statement that the injury was accidental:

"Q. And just so we can be clear. Dr. [Wilion] actually said that it was accidental, correct?

"A. I don't know.

"Q. It's in your case notes, if you'd like to review it. That the notes that Dr. [Wilion] said it was accidental—

"A. I don't recall. I don't have it on me. I . . . don't recall."

The questioning continued as follows:

"Q. So, did you read in the investigator's notes about the—when the child was taken to the family physician, where the family physician said that it was accidental, could have been accidental?

"A. I might have. I don't recall."

In response to a direct question on why she would leave out of her affidavit the part where Berrien said that Lindsey P. could have been hurt through accidental means, Wagner-Morella stated, "I don't know." Wagner-Morella was also asked why she would leave out the fact that the police had closed their investigation. She responded, "I was not aware that the police had closed their investigation at the time that I had written the affidavit."

Wagner-Morella further testified that she did not know why she would leave out the fact that the family pediatrician had stated that the injury was accidental. Wagner-Morella also testified that her supervisors had given her three hours to complete the affidavit and all

of the paperwork necessary to file the application for the order of temporary custody. According to Wagner-Morella, when she is done with the affidavit, it is reviewed and approved by her supervisors. She testified that the documents are reviewed by "[m]y supervisor, my program supervisor and legal consults."

## II

## FINDINGS

It is important to clarify at the outset that the issues that surfaced during the order of temporary custody hearing at the Child Protection Session in Middletown that caused this court to issue a second order to show cause are different from the issues handled by the court on June 9, 2003. At that hearing, the court was addressing the social worker's failure to include a police report with her application for an order of temporary custody.

The issues addressed in the second order to show cause involve misleading and inaccurate statements made in the sworn affidavit. As stated previously in this memorandum of decision, this affidavit was signed and notarized by a notary public. These misstatements were discovered during the hearing on June 12, 2003, while Berrien was testifying, as well as through the testimony of others.

General Statutes § 3-94a is entitled "Notaries public," and contains the definition of both notary public and oath. General Statutes § 3-94a (5) defines notary public or notary as "any person appointed by the Secretary of the State to perform notarial acts." Section 3-94a (6) defines an oath or affirmation as "a notarial act or part thereof in which a notary public certifies that a person has made a vow in the presence of the notary public on penalty of perjury. In the case of an oath, the vow shall include reference to a Supreme Being unless an

affirmation is administered as provided by section 1-23."

The solemnity surrounding the act of administering an oath is codified in General Statutes § 1-22, which mandates that "[t]he ceremony to be used, by persons to whom an oath is administered, shall be the holding up of the right hand . . . ."

In order to assess appropriately and categorize the conduct of the department as an act of contempt toward the court, it is important to discuss the principles surrounding contempt.

"Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense." (Internal quotation marks omitted.) *Wilson* v. *Cohen*, 222 Conn. 591, 596 n.5, 610 A.2d 1177 (1992); *Sheppard* v. *Sheppard*, 80 Conn. App. 202, 219, 834 A.2d 730 (2003). "To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt." (Internal quotation marks omitted.) *Prial* v. *Prial*, 67 Conn. App. 7, 14, 787 A.2d 50 (2001). A finding of contempt "must be established by sufficient proof that is premised upon competent evidence presented to the trial court . . . . We will reverse that finding only if we conclude the trial court abused its discretion." (Internal quotation marks omitted.) *Detels* v. *Detels*, 79 Conn. App. 467, 470, 830 A.2d 381 (2003); see *Behrns* v. *Behrns*, 80 Conn. App. 286, 289, 835 A.2d 68 (2003), cert. denied, 267 Conn. App. 914, 840 A.2d 1173 (2004). "A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in failing to find that the actions or inactions of the [party] were in contempt of a court order." (Internal quotation marks omitted.) *Richards* v. *Richards*, 78 Conn. App. 734, 741–42, 829 A.2d 60, cert. denied, 266 Conn. 922, 835 A.2d 473 (2003); see *Shapiro* v.

*Shapiro*, 80 Conn. App. 565, 572, 835 A.2d 1049 (2003). "When the conduct underlying the alleged contempt does not occur in the presence of the court, a contempt finding must be established by sufficient proof that is premised upon competent evidence presented to the trial court in accordance with the rules of procedure as in ordinary cases." (Internal quotation marks omitted.) *Bryant* v. *Bryant*, 228 Conn. 630, 637, 637 A.2d 1111 (1994); *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 150, 496 A.2d 476 (1985). In *Gina M.G.* v. *William C.*, 77 Conn. App. 582, 823 A.2d 1274 (2003), the court stated: "[O]ur review [of a finding of civil contempt] is technically limited to questions of jurisdiction such as whether the court had authority to impose the punishment inflicted and whether the act or acts for which the penalty was imposed could constitute a contempt. . . . This limitation originates because by its very nature the court's contempt power . . . must be balanced against the contemnor's fundamental rights and, for this reason, there exists the present mechanism for the eventual review of errors which allegedly infringe on these rights. . . . We have found a civil contempt to be improper or erroneous because . . . the findings on which it was based were ambiguous and irreconcilable . . . and the contemnor, through no fault of his own, was unable to obey the court's order." (Internal quotation marks omitted.) Id., 591; see also *In re Jeffrey C.*, 261 Conn. 189, 194–95, 802 A.2d 772 (2002); *Eldridge* v. *Eldridge*, 244 Conn. 523, 527–28, 710 A.2d 757 (1998); *In re Brianna B.*, 66 Conn. App. 695, 705–706, 785 A.2d 1189 (2001); *Wilson* v. *Wilson*, 38 Conn. App. 263, 271, 661 A.2d 621 (1995).

The court finds that at the time of the signing of the affidavit, the social worker knew that the statements contained in the affidavit, and the reasonable inferences that could be drawn from them, were not true and

accurate. The social worker's protestations of ignorance lack credibility. There is no other purpose for this affidavit other than to mislead the court into believing that Lindsey P. was in immediate physical danger from her surroundings and that only her immediate removal from those surroundings would ensure her safety. The court finds that the department intended to manipulate the facts to obtain an order that it knew the facts could not justify.

Although counsel for Gary H. argues that in removing Lindsey P., the department was responding to the criticism it was receiving in the press following the untimely death of a child at or about the time of Lindsey P.'s removal, the evidence before this court fails to support such a finding. Although the court does not discount the possibility that administrative pressures prompted the filing of the order of temporary custody more than two months after the incident, the evidence presented to this court is insufficient to support that finding.

Notwithstanding the findings, the court does not enter an order of contempt. The court determines that a finding of contempt will not adequately address the significant issues appearing in the present case. Although the court is not ordering that the department be held in contempt, that does not mean that it finds the conduct of the department, or its employees, to be acceptable. The conduct was outrageous and insensitive. Our statutes are clear that an order of temporary custody shall issue only when there is "reasonable cause" to believe that a child is in immediate danger from his physical surroundings or is suffering from a physical illness or physical injury.

The ex parte issuance of an order of temporary custody is analogous to the ex parte issuance of a search warrant in a criminal case. In *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1977), the United States Supreme Court stated: "Whether the

Fourth and Fourteenth Amendments, and the derivative exclusionary rule made applicable to the States under *Mapp* v. *Ohio*, 367 U.S. 643 [81 S. Ct. 1684, 6 L. Ed. 2d 1081] (1961), ever mandate that a defendant be permitted to attack the veracity of a warrant affidavit after the warrant has been issued and executed, is a question that encounters conflicting values. The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search. In deciding today that, in certain circumstances, a challenge to a warrant's veracity must be permitted, we derive our ground from language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise: [N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . . Judge Frankel, in *United States* v. *Halsey*, 257 F. Supp. 1002, 1005 (SDNY 1966), aff'd, Docket No. 31369 (CA2, June 12, 1967) (unreported), put the matter simply: [W]hen the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be a *truthful* showing (emphasis in original). This does not mean truthful in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be truthful in the sense that the information put forth is *believed or appropriately accepted by the affiant as true.* It is established law, see *Nathanson* v. *United States*, 290 U.S. 41, 47 [54 S. Ct. 11, 78 L. Ed. 159] (1933); *Giordenello* v. *United States*, 357 U.S. 480, 485–86 [78 S. Ct. 1245, 2 L. Ed. 2d 1503] (1958); *Aguilar* v. *Texas*, 378 U.S. 108, 114–15 [84 S. Ct. 1509, 12 L. Ed. 2d 723] (1964), that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so

as to allow the magistrate to make an independent evaluation of the matter." (Emphasis in original; internal quotation marks omitted.) *Franks* v. *Delaware,* supra, 438 U.S. 164–65; see *Ham* v. *Greene,* 248 Conn. App. 508, 521, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999); *State* v. *Thatcher,* 71 Conn. App. 516, 526, 802 A.2d 908, cert. denied, 261 Conn. 940, 808 A.2d 1134 (2002).

In *State* v. *Glenn,* 47 Conn. App. 706, 707 A.2d 736 (1998), aff'd, 251 Conn. 567, 740 A.2d 856 (1999), the court stated, "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *State* v. *Stepney,* 191 Conn. 233, 237–38, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984)." (Internal quotation marks omitted.) *State* v. *Glenn,* supra, 708.

Although the exclusionary rules do not apply in the circumstances presented here, the rights involved are constitutionally protected, urging the court to act swiftly.

A judge of the Superior Court is expected to act on *verified allegations* filed with the court. It is fundamental that the judge should be able to rely on the accuracy of those allegations, especially when taking ex parte action, ostensibly for the protection of a child.

This court will not countenance a lackadaisical attitude by the department when its employees present facts in support of an order of temporary custody. As counsel for the respondent father, Gary H., correctly points out, when the state intrudes on the sanctity of the family unit, it must always be mindful that the right to family integrity is fundamental. A family has a right "to remain together without the coercive interference of the awesome power of the state." *Duchesne* v. *Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977); see also *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *In re Juvenile Appeal*, 189 Conn. 276, 284, 455 A.2d 1313 (1983).

Unfortunately, it is not within the power of this court, nor any of the parties, to redress harm that may have been done to Lindsey P. as a result of her forced removal from her father without justification or excuse. How can anyone remedy the insecurity and stigma associated with an untimely and unjust removal?

The state, either consciously or with a reckless disregard for the truth, determined not to include information and evidence that was favorable to the respondent father when pursuing an order of temporary custody more than two months after its own reviewing physician stated his belief that the injuries to Lindsey P. were "accidental." Furthermore, the department chose to ignore the conclusions in a police report as well as the conclusions of its own investigator, which were that the injuries were accidental.

This rush to judgment by the department could have had tragic and far-reaching consequences. Removal of a child from a home environment must be undertaken with care together with a recognition of the fundamental nature of the family relationship.

Although the court does not enter a finding of contempt, under its inherent supervisory authority, the court can deter similar conduct by the department in the future.

The department is therefore directed, when presenting an application for an ex parte order of temporary custody, to include in its materials all information which is exculpatory or favorable to the parents or guardians. The overriding concern for family integrity demands nothing less.

The court further orders that a copy of this memorandum of decision be sent to the supervisor of Wagner-Morella's social work unit, as well as to the administrator of that unit. A copy of this memorandum of decision shall also be sent to the state office of the child advocate and to the office of the federal court monitor.

The supervisors and the administrators of Wagner-Morella's social work unit are directed to appear before this court on May 27, 2004, at 10 a.m. to describe the steps that have been taken to prevent this type of omission from occurring again in their region. The court expects that part of the steps will include a review of the criminal laws of perjury as well as instruction in recognized best practices for the removal of children from their homes.

## III

## REASONABLE EFFORTS

Section 101 (a) (B) of the federal Adoption and Safe Families Act of 1997, 49 U.S.C. § 620 et seq., amends 42 U.S.C. § 671 (a) (15), and is entitled, "State plan for foster care and adoption assistance." This amendment states, "In order for a State to be eligible for payments under this part [42 U.S.C. § 670 et seq.], it shall have a plan approved by the Secretary which . . . provides that . . . except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families–(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home . . . ."

The public policy articulated in this statute is incorporated into the Code of Federal Regulations and can be found in 45 C.F.R. § 1356.21. Subsection (b) of this section, entitled, "Reasonable Efforts," discusses reasonable efforts as follows: "The State must make reasonable efforts to maintain the family unit and prevent the unnecessary removal of a child from his/her home, as long as the child's safety is assured; to effect the safe reunification of the child and family . . . ."

In 45 C.F.R. § 1356.21 (b) (1), the regulations detail how the state will be monitored for compliance with this requirement. Specifically, the regulation calls for a judicial finding that reasonable efforts to prevent the removal were made by the state. The regulation provides in pertinent part: "(1) Judicial determination of reasonable efforts to prevent a child's removal from the home.

"(i) When a child is removed from his/her home, the judicial determination as to whether reasonable efforts were made, or were not required to prevent the removal . . . must be made no later than 60 days from the date the child is removed from the home. . . ." 45 C.F.R. § 1356.21 (b) (1).

The consequences of not making the finding within the time frame, or of a finding that reasonable efforts to prevent the removal were not made, are monetary. The next pertinent section of the regulation, 45 C.F.R. § 1356.21 (b) (1) (ii), provides: "If the determination concerning reasonable efforts to prevent the removal is not made as specified in paragraph (b) (1) (i) of this section, *the child is not eligible under the title IV-E foster care maintenance payments program for the duration of that stay in foster care.*" (Emphasis added.)

Plainly stated, this means that the state will not be reimbursed by the federal government for the costs incurred while keeping a child in foster care if it is

found that reasonable efforts to prevent the removal were not made.

Judicial oversight is key to maintaining balance when the state steps into a family to remove a child from his or her home. The court must look for the steps that have been taken to keep the child in his home, and these steps must be reasonable.

Prior to the final enactment of 45 C.F.R. § 1356.21, the federal Department of Health and Human Services, administration for children and families (administration), issued a "Notice of Proposed Rulemaking" on September 18, 1998. This is a process designed to invite public comment on the proposed rule from interested persons and agencies working in the child welfare field.

Many in the field commented that the administration was "overly harsh in prohibiting title IV-E eligibility for an entire foster care episode if the reasonable efforts to prevent removal requirements were not satisfied." Judicial Determination of Reasonable Efforts To Prevent a Child's Removal From the Home, 65 Fed. Reg. 4051, 4052 (January 25, 2000), codified at 45 C.F.R. § 1356.21 (b) (1) (2001). The response to this comment highlights the significance of a judicial finding in the view of the administration.

"Response: The requirement for the State to make reasonable efforts to prevent removals is a fundamental protection under the Act and one of several title IV-E eligibility criteria used in establishing eligibility. From both a practice and an eligibility perspective, it is impossible for the State to provide efforts to prevent the removal of a child from home after the fact.

"In terms of practice, there is a profound effect on the child and family once a child is removed from home, even for a short time, that cannot be undone. If the child is returned after services have been delivered, or

even immediately, the State has reunified the family, not prevented a removal.

"The statute requires that title IV-E eligibility be established at the time of a removal. If the State does not make reasonable efforts to prevent a removal or fails to obtain a judicial determination with respect to such efforts, the child can never become eligible for title IV-E funding for that entire foster care episode because there is no opportunity to establish eligibility at a later date . . . ." 65 Fed. Reg., supra, 4052.

On May 29, 2003, as part of the order of temporary custody application, Judge Harleston was presented with a form entitled, "Affidavit #1, Affidavit to Remove Child pursuant to an Order of Temporary Custody/ Order to Show Cause." The form requires the department to list the efforts that were made to prevent the removal of the child from the home or to list the reasons that preventive efforts were not possible. Upon consideration of the evidence presented in the affidavits seeking an order of temporary custody, the court must make findings of facts and enter orders regarding preventive efforts made by the state.

In this affidavit, Wagner-Morella represented that "[f]ather has been offered substance abuse evaluation and treatment, anger management [and] parenting classes. Mother has been offered mental health treatment, transportation and case management."

As stated previously in this memorandum of decision, Gary H. was not referred for substance abuse treatment as the evaluation determined that he did not need such treatment. This fact was confirmed by the social worker herself on April 15, 2003. Although Gary H. was referred to anger and parenting classes, he had not yet started because he was on a waiting list. On May 29, 2003, on the basis of inaccurate and misleading information, Judge Harleston entered findings that the state had

made reasonable efforts to prevent the removal of Lindsey P. from her home.

After a full and thorough hearing on this matter before this court, it is clear that the department did not make reasonable efforts to prevent the removal of Lindsey P. from her home. In fact, what does appear certain is that extraordinary efforts were made to remove her from her home and father. The court, therefore, vacates the previously entered finding that reasonable efforts to prevent the removal were made. The court finds that reasonable efforts to prevent Lindsey P.'s removal from her home were not made.

The court orders the department to inform the appropriate federal and state agencies of this order and to provide proof of this notification to this court within thirty days. The court will schedule this matter as a docket matter on March 24, 2004, for receipt of the notice to the appropriate authorities.