******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOAN O'ROURKE *v.* DEPARTMENT OF LABOR ET AL.
(AC 43519)

Alvord, Prescott and DiPentima, Js.

*Syllabus*

The plaintiff, a former employee of the defendant Department of Children
and Families (department), appealed to this court from the judgment
of the trial court dismissing her administrative appeal from the decision
of the defendant Department of Labor, State Board of Labor Relations,
concluding that she had failed to establish that the defendant union had
breached its duty of fair representation during arbitration proceedings
with the department regarding whether the department had just cause
to terminate the plaintiff's employment. In her position with the depart-
ment, the plaintiff investigated allegations of child abuse and neglect.
After completing an investigation of a particular case involving a moth-
er's alleged neglect of her two children, the plaintiff submitted to her
supervisor, F, a draft investigative report, which concluded that, with
respect to one of the children, the allegation was not substantiated. F
disagreed with various parts of the draft report and made various
changes in the final draft of that report to address her concerns. On
the basis of the information included in the final report, the department
filed an application for an ex parte order of temporary custody. The
plaintiff, believing that the final report contained false and misleading
information and omitted certain exculpatory information, and without
notifying or obtaining permission from the department, sent a copy of
the draft report to the attorney who represented the mother in the
order of temporary custody proceedings. Thereafter, a human resources
specialist for the department initiated an investigation of the plaintiff
relating to her disclosure of the confidential, draft report. He determined
that she had violated various department policies, a state statute ((Supp.
2010) § 17a-28), and a state regulation (§ 5-240-1a (c)), and the depart-
ment terminated her employment. The union filed a grievance on behalf
of the plaintiff, claiming that the department had terminated her employ-
ment without just cause in violation of the applicable collective bar-
gaining agreement. C, an agent of the union, represented the plaintiff
in the proceedings related to her grievance. After a hearing officer
dismissed the grievance, the union requested review by an arbitrator.
At the conclusion of the arbitration proceedings, the arbitrator dismissed
the grievance, and the plaintiff filed a complaint with the board against
both the department and the union. The board dismissed the action, and
the plaintiff appealed to the trial court, which dismissed her appeal. *Held*:

1. This court declined to review the plaintiff's unpreserved claim that the
   union breached its duty of fair representation by failing to argue to the
   arbitrator that the plaintiff was required to release the draft report
   pursuant to (Supp. 2010) § 17a-28 (f) and (m): the plaintiff conceded
   that she did not raise her argument concerning the applicability of the
   statute to the board; moreover, the mere fact that the arbitrator, the
   board, and the union were aware that (Supp. 2010) § 17a-28 existed
   was insufficient to establish that the plaintiff distinctly or precisely
   articulated to the board why the statute was applicable or how it obli-
   gated the plaintiff to release the draft report.

2. The plaintiff failed to meet her burden of demonstrating that the board
   had acted unreasonably, arbitrarily, illegally or in abuse of its discretion
   in determining that the union had not acted arbitrarily or in bad faith
   in its representation of the plaintiff by failing to argue that *In re Lindsey
   P.* (49 Conn. Supp. 132) required the plaintiff to disclose the draft report:
   it was unclear whether the directive issued by the trial court in *In re
   Lindsey P.* applied outside of that case and to conclude that C had
   acted arbitrarily or in bad faith by failing to present such a legal argument
   would impose a duty on the union greater than that of fair representation;
   moreover, even if the directive set forth in *In re Lindsey P.* did apply
   outside of that case, it arguably was inapplicable to the plaintiff in the
   present case, as it instructed the department, rather than individual
   social workers, to include information that was exculpatory or favorable

to the parents in its application for an ex parte order of temporary custody; furthermore, the trial court properly determined that substantial evidence supported the factual finding of the board that C had argued to the arbitrator that the draft report contained exculpatory information, as he brought to the attention of the arbitrator the differences between the draft and final reports.

Argued December 1, 2021—officially released March 1, 2022

*Procedural History*

Appeal from the decision of the named defendant dismissing the plaintiff's complaint challenging the termination of her employment by the defendant Department of Children and Families and alleging that the defendant AFSCME, AFL-CIO, Council 4, Local 2663 breached its duty of fair representation, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Cordani, J.*; judgment dismissing the appeal, from which the plaintiff appealed to this court. *Affirmed.*

*Austin Berescik-Johns*, for the appellant (plaintiff).

*Frank N. Cassetta*, general counsel, with whom was *J. Brian Meskill*, assistant general counsel, for the appellee (named defendant).

*Richard T. Sponzo*, assistant attorney general, for the appellee (defendant Department of Children and Families).

*Anthony J. Bento*, for the appellee (defendant AFSCME, AFL-CIO, Council 4, Local 2663).

*Opinion*

PRESCOTT, J. In this administrative appeal, the plaintiff, Joan O'Rourke, appeals from the decision of the Superior Court, affirming the dismissal of her hybrid action[1] against the defendant AFSCME, AFL-CIO, Council 4, Local 2663 (union) and the defendant Department of Children and Families (department) by the Department of Labor, State Board of Labor Relations (board), a codefendant in this case. Following the termination of the plaintiff's employment with the department, the union filed a grievance on her behalf and represented her in an arbitration proceeding. After the arbitrator determined that the department had just cause to terminate the plaintiff's employment, the plaintiff filed a complaint with the board and, ultimately, appealed the decision of the board to the Superior Court. On appeal, the plaintiff claims that the Superior Court improperly determined that substantial evidence supported the findings of the board and that the board reasonably concluded that the plaintiff had failed to establish that the union breached its duty of fair representation. The plaintiff specifically contends that the union breached its duty of fair representation because it failed to make two particular legal arguments to the arbitrator. We affirm the decision of the Superior Court.

The following facts, which the board found, and procedural history are relevant to our resolution of the present appeal. The union represents a bargaining unit composed of department employees, including social workers and social work supervisors. In 2004, the department hired the plaintiff as a social work trainee and, in 2006, promoted her to the position of full-time social worker.

In 2009, the plaintiff became an investigative social worker for the department.[2] In this position, the plaintiff investigated allegations of child abuse and neglect to determine whether there was evidence to substantiate the allegations. Generally, after being assigned a case, the plaintiff would review the family's prior history with the department, conduct home visits, review relevant records, and conduct interviews with individuals, including the children, their parents, other family members, witnesses, health care providers, counselors, school staff, and law enforcement officials. The plaintiff would document her investigation and her conclusions concerning the safety of the children in a draft investigative report.[3] Once she completed her investigation, the plaintiff would submit electronically her draft investigative report to her supervisor for approval. If her supervisor determined that the investigative report required additional information, the supervisor either would add the additional information or request that the plaintiff make the necessary changes.

In March, 2011, Sandra Fitzpatrick, a social work

supervisor for the department, became the immediate supervisor of the plaintiff. In the following two months, the department received reports that alleged that a mother of two children was neglecting them. Specifically, according to the allegations, the mother had refused to take her son to outpatient therapy sessions or to have her son evaluated by a psychiatrist, which evaluation the son needed in order to attend school. Further, the mother allegedly had prevented her daughter from attending school. Fitzpatrick assigned the plaintiff to investigate the allegations, and, following the completion of her investigation, the plaintiff submitted to Fitzpatrick a thirty page, draft investigative report.

In the draft report, the plaintiff concluded that the allegation of educational neglect of the son was not substantiated.[4] According to the plaintiff, a school psychologist who had examined the son determined that " '[the son] [wa]s [psychotic] because he [was] hear[ing] voices,' " but a clinician who had evaluated the son did not observe that the son had experienced any such auditory hallucinations. According to the plaintiff, after the son was hospitalized in connection with concerns about his mental health, administrators from his school would not allow him to return to school until he underwent a psychiatric evaluation. The plaintiff reported that, although the son had not received a psychiatric evaluation and, thus, had not returned to school, the school nonetheless had excused his absences. She thus determined that the mother and the school administrators simply were "at odds" with respect to the needs of the son. The plaintiff recommended that the case be transferred to another unit within the department and that further support be provided to the family.

Fitzpatrick reviewed the draft investigative report and disagreed with various parts of it. For example, Fitzpatrick contended that a *clinician*, not school administrators, recommended that the son be evaluated by a psychiatrist before returning to school. Fitzpatrick made changes to the draft investigative report to address her concerns, including removing a reference to the fact that the clinician who had evaluated the son did not observe that the child was "hear[ing] voices" and editing the report to reflect that the *clinician*, not school administrators, had directed that the son be evaluated by a psychiatrist before he returned to school. Fitzpatrick also added that the clinician had "wanted to admit" the son to the hospital but that his "mother [had] refused," notwithstanding the fact that the son was "hearing voices and . . . [expressed] at [the] hospital that he wanted to kill himself . . . ." The final version of the report incorporated the changes that Fitzpatrick had made. Fitzpatrick subsequently removed the plaintiff from investigating the case and reassigned the case to another social worker.

In light of the information in the final investigative report, the department filed an application for an ex parte order of temporary custody (OTC) of both children. When the plaintiff became aware that the department had filed the application for an OTC, she felt "troubled . . . ." The plaintiff believed that the final investigative report and the documents related to the application, both of which she had reviewed, contained false and misleading information that did not represent accurately the circumstances surrounding the family. The plaintiff submitted a complaint to Vannessa Dorantes, an office director for the department, in which the plaintiff insisted that Fitzpatrick had removed "exculpatory information" or, in her words, information " 'that . . . tend[ed] to [demonstrate] the innocence of' " the mother, which the plaintiff intentionally had included in the draft investigative report. The plaintiff contended that the documents that the department filed in conjunction with its application for an OTC likewise omitted the "exculpatory" information that she had included in the draft investigative report. The plaintiff maintained that Fitzpatrick had mishandled the investigation and had mischaracterized the facts of the case in the final investigative report.

The plaintiff also sent a copy of her draft investigative report to assistant attorney general Cynthia Mahon, who represented the department in the proceedings on the application for an OTC. Mahon compared the draft and final investigative reports, ultimately disagreed with the plaintiff that the final investigative report omitted " 'salient exculpatory information' " that the plaintiff had included in the draft investigative report, and concluded that the final investigative report correctly represented the relevant facts of the case. The department then proceeded with its filing of an application for an ex parte OTC of the children.

On June 23, 2011, without notifying or obtaining permission from the department, the plaintiff sent a copy of the confidential,[5] draft investigative report to the attorney who represented the mother in the OTC proceedings. At a hearing concerning the application for an OTC that same day, counsel for the mother brought the draft investigative report to the attention of the court, and the department agreed to withdraw the application for an OTC of the daughter,[6] so long as the mother abided by certain conditions, including bringing her daughter to therapy sessions. On the following day, however, the department filed a second application for an OTC of the daughter after the department received allegations of sexual abuse of the daughter.

Tyrone Mellon, a principal human resources specialist for the department, subsequently initiated an investigation of the plaintiff regarding her disclosure of the confidential, draft investigative report. As part of his investigation, Mellon searched the plaintiff's work com-

puter and her e-mail communications. He uncovered that, between March, 2006, and September, 2010, the plaintiff had sent nine e-mails, which contained confidential department information, to her then husband, who was not an employee of the department. Additionally, the department received a report that, in May, 2011, the plaintiff had left a five year old child unattended in a car while transporting children to foster homes on behalf of the department. The plaintiff admitted to Mellon that she had sent the draft investigative report to counsel for the mother without authorization from the department, e-mailed confidential information to a nonemployee on nine occasions, and left the five year old child unattended in a car. At the conclusion of his investigation, Mellon determined that, in his opinion, the plaintiff had violated various department policies, a state statute, and a state regulation.[7]

On November 17, 2011, Dorantes notified the plaintiff by letter that, effective November 29, 2011, her employment with the department would be terminated. Dorantes provided as grounds for the termination that the plaintiff had released the confidential, draft investigative report without authorization from the commissioner of the department or her designee, had sent via e-mail confidential department information to a nonemployee, and had left a child, who was in the care of the department, unattended in a car.

The union filed a grievance on behalf of the plaintiff, claiming that the department had terminated her employment without just cause in violation of the applicable collective bargaining agreement.[8] Neal Cunningham, an agent of the union, represented the plaintiff in the proceedings related to her grievance. The state office of labor relations convened a step two grievance hearing, and a hearing officer dismissed the grievance, concluding that the department had just cause to terminate the plaintiff's employment. The union requested review by an arbitrator of the dismissal of the grievance, and an arbitration proceeding took place over several nonconsecutive days in May through August, 2012.

Cunningham, in his capacity as a union agent, represented the plaintiff during the arbitration proceeding. Cunningham called witnesses, including the plaintiff, to testify on her behalf and cross-examined the witnesses called by the department. Following the conclusion of the arbitration hearing, Cunningham submitted a brief to the arbitrator on behalf of the plaintiff, in which he argued that the department lacked just cause to terminate her employment.

The arbitrator dismissed the grievance. The arbitrator determined that the department had just cause to terminate the plaintiff's employment based solely on her unauthorized disclosure of the confidential, draft investigative report to counsel for the mother.[9] The arbitrator acknowledged that the plaintiff believed that

the only way she could remediate what she understood to be "false" representations in the final investigative report "was to [release] confidential [department] records" to counsel for the mother without first obtaining permission from the department. The arbitrator, however, disagreed with the plaintiff that she had the right to release the draft investigative report under the circumstances. The arbitrator stated that the plaintiff could have addressed her concerns in a way that would not have violated various confidentiality rules, such as testifying about the case in court.[10]

Following the issuance of the arbitration award, the plaintiff filed a complaint with the board against the union and the department. The plaintiff alleged in her complaint to the board a hybrid claim that the union violated the Collective Bargaining for State Employees Act (act), General Statutes § 5-270 et seq., by breaching its duty of fair representation during the arbitration proceeding and that the department violated the act by terminating her employment without just cause. The plaintiff argued, inter alia, that the union had breached its duty of fair representation by failing to emphasize certain arguments to the arbitrator—namely, that Fitzpatrick had "lied" in the final investigative report and had "targeted" the plaintiff—and by mischaracterizing or omitting facts and arguments in the postarbitration brief it filed on her behalf. The plaintiff contended that the department had terminated her employment without just cause and that, had the union fairly represented her during the arbitration proceeding, she would have been reinstated to her position of employment with the department. The board held a series of hearings between April, 2014, and February, 2018, and, following the conclusion of the hearings, received posthearing briefs from the parties.

In a memorandum of decision dated September 6, 2018, the board dismissed the hybrid action. The board rejected each of the arguments that the plaintiff raised and concluded that the plaintiff had failed to establish that the union breached its duty of fair representation. The board noted that, because the plaintiff admitted that she had committed each instance of conduct for which she was terminated, the union reasonably focused its argument to the arbitrator on attacking whether the department had just cause to terminate her in light of her undisputed conduct or, instead, should have imposed some other form of lesser discipline. The board acknowledged that the union specifically emphasized to the arbitrator that the final investigative report contained " 'inaccuracies' " and omitted information that the plaintiff believed to be " 'exculpatory,' " which, in the view of the plaintiff, triggered her right or duty to release the draft investigative report. The board found that the union had stressed to the arbitrator that the plaintiff had raised her concerns to the department and Mahon and, when the department

and Mahon took no action to address them, that the plaintiff felt that she had no choice but to release the draft investigative report. Although the board acknowledged that the union did not "highlight every" difference between the draft and final investigative reports to the arbitrator, it determined that the union had underscored to the arbitrator the changes that the plaintiff believed to be significant.

The board determined that the plaintiff did not meet her burden of establishing that the union breached its duty of fair representation. Although the board noted that the plaintiff was "dissatisf[ied] with the union's strategy and tactics," the board concluded that Cunningham "made legitimate tactical and strategic choices as expected of a union advocate" and that the union did not, as the plaintiff contended, act arbitrarily, discriminatorily, or in bad faith in its representation of her.

The plaintiff appealed the decision of the board to the Superior Court, and the court ultimately dismissed her appeal. The court determined that substantial evidence supported the findings of the board. The court determined that the board reasonably concluded that the plaintiff had failed to establish that the union breached its duty of fair representation. This appeal followed. Additional procedural history will be set forth as necessary.

On appeal to this court, the plaintiff claims that the Superior Court improperly determined that substantial evidence supported the findings of the board and that the board reasonably concluded that the plaintiff had failed to establish that the union breached its duty of fair representation. In connection with her sole claim on appeal,[11] the plaintiff advances two related arguments. First, she argues that the union acted arbitrarily, discriminatorily, or in bad faith by failing to argue to the arbitrator that she was *required* by statute to release the draft investigative report to counsel for the mother. Second, she asserts that the union acted arbitrarily or in bad faith by failing to argue to the arbitrator that, under *In re Lindsey P.*, 49 Conn. Supp. 132, 864 A.2d 888 (2004) (*Lindsey P.*), she was required to release the draft investigative report to counsel for the mother because Fitzpatrick removed from the final investigative report "exculpatory" information that the plaintiff had included in the draft investigative report.

We begin our analysis by setting forth the well established standard governing our review of this claim. "[J]udicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., and the scope of that review is limited. . . . When reviewing the trial court's decision, we seek to determine whether it comports with the [UAPA]. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the admin-

istrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Conclusions of law reached by the administrative agency must stand if . . . they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of [its] discretion." (Internal quotation marks omitted.) *AFSCME, AFL-CIO, Council 4, Local 2405* v. *Norwalk*, 156 Conn. App. 79, 85–86, 113 A.3d 430 (2015).

Before we turn to the law that governs the plaintiff's claim, we emphasize that, pursuant to statute, records, defined as "information created or obtained in connection with the department's child protection activities or activities related to a child while in the care or custody of the department"; General Statutes (Supp. 2010) § 17a-28 (a) (5); that are maintained by the department are "confidential" and generally "shall not be disclosed" in the absence of "written consent" from the individual about which the record is written, his parent, or his authorized representative.[12] General Statutes (Supp. 2010) § 17a-28 (a) (1) and (b). Accordingly, the draft investigative reports prepared by the plaintiff were "confidential" records. General Statutes (Supp. 2010) § 17a-28 (b). *Only* the "commissioner or the commissioner's designee . . . [was authorized by statute to] provide copies of [these confidential] records, without . . . consent . . . to . . . (9) a party in a custody proceeding under section 17a-112 or 46b-129, in the Superior Court where such records concern[ed] a child who [wa]s the subject of the proceeding or the parent of such child . . . ." General Statutes (Supp. 2010) § 17a-28 (f).

We next turn to the applicable law that governs a claim of breach of the duty of fair representation by a union. General Statutes § 5-271 (d) provides in relevant part: "When an employee organization has been designated . . . as the exclusive representative of employees in an appropriate unit, it shall have a duty of fair representation to the members of that unit." "This duty of fair representation derives from the union's status as the sole bargaining representative for its members. As such, the union has the exclusive right and obligation to act for its members and to represent their interests." *Labbe* v. *Pension Commission*, 239 Conn. 168, 193, 682 A.2d 490 (1996). "The duty of fair representation requires the union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion in complete good faith and honesty, and to avoid arbitrary conduct." (Internal quotation

marks omitted.) *Piteau* v. *Board of Education,* 300 Conn. 667, 674 n.7, 15 A.3d 1067 (2011). "Employee organizations or their agents are prohibited from . . . (4) breaching their duty of fair representation . . . ." General Statutes § 5-272 (b). Consequently, "[a] union must represent its members in good faith." (Internal quotation marks omitted.) *Piteau* v. *Board of Education,* supra, 674 n.7.

We note that neither our jurisprudence nor the applicable statutory scheme imposes on agents of a union, in the representation of bargaining unit members, a duty beyond the duty of fair representation. See id., 674 n.7, 677 n.12; see also General Statutes § 5-271. It is therefore axiomatic that union agents, in the representation of bargaining unit members, are not obligated to, for example, exercise the same degree of skill as lawyers in their representation of clients. See, e.g., *Updike, Kelly & Spellacy, P.C.* v. *Beckett,* 269 Conn. 613, 649, 850 A.2d 145 (2004) (discussing legal malpractice and requiring lawyers to "exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the [legal] profession" (internal quotation marks omitted)). Put differently, and as the United States Court of Appeals for the Sixth Circuit has explained, "union agents are not lawyers,[13] and as a general proposition, cannot be held to the same standard as that of licensed professionals." (Footnote added.) *Garrison* v. *Cassens Transport Co.,* 334 F.3d 528, 539 (6th Cir. 2003), cert. denied, 540 U.S. 1179, 124 S. Ct. 1413, 158 L. Ed. 2d 80 (2004).

"The standard for a claim of breach of duty of fair representation is well established." *Council 4, AFSCME, AFL-CIO* v. *State Board of Labor Relations,* 111 Conn. App. 666, 673, 961 A.2d 451 (2008), cert. denied, 291 Conn. 901, 967 A.2d 112 (2009). "A union breaches th[e] duty [of fair representation] if it acts arbitrarily, discriminatorily or in bad faith." (Internal quotation marks omitted.) *Piteau* v. *Board of Education,* supra, 300 Conn. 674 n.7. The plaintiff has "the burden of demonstrating breach of [the] duty [of fair representation] by the [u]nion." (Internal quotation marks omitted.) Id., 677 n.12.

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness . . . as to be irrational." (Internal quotation marks omitted.) *Labbe* v. *Pension Commission,* supra, 239 Conn. 195. For example, "[a] union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion . . . ." (Internal quotation marks omitted.) *Tedesco* v. *Stamford,* 222 Conn. 233, 248, 610 A.2d 574 (1992); see also *Vaca* v. *Sipes,* 386 U.S. 171, 191, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967). Our Supreme Court has explained that, although

a union does not "have unfettered discretion when deciding *whether* to take [an employee's meritorious] grievance to arbitration"; (emphasis added) *Tedesco* v. *Stamford*, supra, 247; it properly may exercise, in good faith, its "discretion . . . to [determine] *which* grievances [are meritorious and thus should be] submit[ted] to arbitration" on behalf of the employee. (Emphasis added.) Id., 248.

"[A] union's actions are in bad faith if the union acts fraudulently or deceitfully . . . or does not act to further the best interests of its members." (Citation omitted.) *Labbe* v. *Pension Commission*, supra, 239 Conn. 195. For example, our Supreme Court has observed that, when a union "*deliberately* misrepresent[ed] to employees . . . [that the] rights [that were] guaranteed [to them] under [a] collective bargaining agreement [had changed, the union had] violat[ed] [its] duty of fair representation . . . ." (Emphasis added; internal quotation marks omitted.) Id., 197; see also *Lewis* v. *Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1143 (2d Cir. 1994). By contrast, if there is no evidence that the union acted fraudulently or intentionally to deceive an employee, it cannot be said that the union acted in bad faith. See *Labbe* v. *Pension Commission*, supra, 196–97. For instance, "[a] breach [by a union agent] of the [union] bylaws alone, unaccompanied by proof of malicious intent, hostility, discrimination, dishonesty or fraud is insufficient to prove bad faith." Id., 198 n.17.

I

The plaintiff first contends that the court improperly determined that the board reasonably concluded that the union did not breach its duty of fair representation because the union acted arbitrarily, discriminatorily, or in bad faith by failing to argue to the arbitrator that she was *required* to release the draft investigative report by General Statutes (Supp. 2010) § 17a-28 (f) (9) and (m).[14] Although the plaintiff did not raise this argument before the board, as she acknowledged during oral argument to this court, or before the Superior Court, the plaintiff maintains that this court nonetheless may consider the merits of the argument. Specifically, the plaintiff contends that, because the department cited General Statutes (Supp. 2010) § 17a-28 as a basis for the termination of her employment, the arbitrator referenced the statute in its award, and the union submitted the statute to the board as an exhibit, her argument is preserved. We are not persuaded.

"Our appellate courts, as a general practice, will not review claims made for the first time on appeal." *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619, 99 A.3d 1079 (2014). "This rule applies to appeals from administrative proceedings . . . ." *Ferraro* v. *Ridgefield European Motors, Inc.*, 313 Conn. 735, 759, 99 A.3d 1114 (2014). "A party to an administrative proceeding cannot be allowed to participate fully at hearings and

then, on appeal, raise claims that were not asserted before the board." *Dragan* v. *Connecticut Medical Examining Board*, 223 Conn. 618, 632, 613 A.2d 739 (1992). Thus, "[t]he failure to raise [a] claim . . . at the time of the [administrative] hearing precludes [a party] from raising the issue on appeal." *Berka* v. *Middletown*, 205 Conn. App. 213, 218, 257 A.3d 384, cert. denied, 337 Conn. 910, 253 A.3d 44 (2021), cert. denied, U.S. , 142 S. Ct. 351, 211 L. Ed. 2d 186 (2021).

Our Supreme Court has explained that, within the context of administrative appeals, appellate courts "shall not be bound to consider a claim unless it was *distinctly* raised at the [administrative hearing] or arose subsequent to the [hearing]. . . . Indeed, it is the appellant's responsibility to present such a claim clearly to the [administrative board] so that the [board] may consider it and, if it is meritorious, take appropriate action." (Emphasis added; internal quotation marks omitted.) *Ferraro* v. *Ridgefield European Motors, Inc.*, supra, 313 Conn. 758–59. "The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked." (Emphasis in original; internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, supra, 313 Conn. 620; see also *Commissioner of Mental Health & Addiction Services* v. *Saeedi*, 143 Conn. App. 839, 855–56, 71 A.3d 619 (2013) (setting forth same principle in administrative appeal and applying it to claim that was not distinctly raised before administrative board).

In the present case, a review of the transcripts from the board hearings and the posthearing briefs that the plaintiff submitted to the board reveal, and the plaintiff has conceded, that she did not raise before the board that the union breached its duty of fair representation by failing to argue to the arbitrator that she was *required* to release the draft investigative report by General Statutes (Supp. 2010) § 17a-28 (f) (9) and (m). Because the record demonstrates that the plaintiff neither distinctly nor precisely articulated her argument concerning the applicability of the statute to the board; see *White* v. *Mazda Motor of America, Inc.*, supra, 313 Conn. 620; see also *Commissioner of Mental Health & Addiction Services* v. *Saeedi*, supra, 143 Conn. App. 855–56; her reliance on the arbitrator's, the board's, and the union's general awareness of General Statutes (Supp. 2010) § 17a-28 is misplaced. The mere fact that the arbitrator, the board, and the union were aware that the statute existed is insufficient to establish that the plaintiff distinctly or precisely articulated to the board why the statute was applicable in the present case or how the statute obligated *the plaintiff* to release the draft investigative report. Accordingly, we conclude that the issue was not preserved adequately for appellate review, and we decline to review it.[15]

## II

The plaintiff next argues that the court improperly determined that the board reasonably concluded that the union did not breach its duty of fair representation because the union acted arbitrarily or in bad faith by failing to argue to the arbitrator that, in accordance with *In re Lindsey P.*, supra, 49 Conn. Supp. 132, the plaintiff was required to release the draft investigative report to the court and counsel for the mother because the final investigative report improperly omitted information that was exculpatory and favorable to the mother.[16] The plaintiff specifically asserts that the union should have argued to the arbitrator that the Superior Court in *Lindsey P.* mandated the department to include in any application for an ex parte OTC all information that is exculpatory or favorable to the respondents. The plaintiff also argues that the decision in *Lindsey P.* obligated the plaintiff to turn over the draft investigative report because the court in that case had admonished a social worker for omitting from an affidavit certain information that was favorable to the respondent and directed the department to turn over information that was exculpatory or favorable to the respondent. In connection with this argument, the plaintiff also contends that the union did not emphasize sufficiently to the arbitrator that the draft investigative report contained exculpatory information that Fitzpatrick omitted from the final investigative report, such that, under *Lindsey P.*, she was obligated to turn over the draft investigative report.

We begin our analysis with a brief overview of the decision of the Superior Court in *Lindsey P.* In that case, the department filed an ex parte OTC application, based on the alleged physical abuse of a child by her father. Id., 132–33. In conjunction with its application for the ex parte order, the department submitted an affidavit from a social worker. Id., 133. The affidavit averred that the child had sustained a fractured clavicle as a result of the physical abuse inflicted on her by her father and, in light of her injuries and prior, unrelated instances of abuse of the other children of the father, the child was in immediate physical danger. Id. The social worker also represented in the affidavit that the child had been physically examined by a specific doctor in connection with her injuries. Id. The department and the father later presented to the court, *Lopez, J.*, an agreement under which, inter alia, the father would enter a plea of nolo contendere to the underlying neglect petition and the court would enter a dispositional order of protective supervision for a limited time period. Id., 132–33.

Before it accepted the agreement, the court requested that the doctor who the social worker had identified in the affidavit testify concerning the extent of the child's injuries. Id., 133. The doctor testified, contrary to the

representations that the social worker had made in the affidavit, that he had not physically examined the child; he merely had reviewed the medical reports that the department had provided to him. Id., 134. The doctor also testified, consistent with the report he had prepared, that the injuries could have been inflicted on the child " 'accidental[ly]' " and that he recommended that the father be enrolled in parenting classes. Id., 133–34. The affidavit accompanying the OTC application did not include the opinion of the doctor that the injuries could have been accidental or his recommendation that the father be enrolled in parenting classes. Id., 134. The social worker also failed to include in her affidavit the conclusion of the child's pediatrician that the injuries to the child did not necessarily result from physical force but, instead, could have resulted from the child falling out of her bed. Id., 134–35, 145.

The court held a series of hearings to determine whether it would hold the department in contempt for failing to provide accurate information to the court when it initially had filed its application for the ex parte OTC of the child. Id., 134–35. The court ultimately decided not to hold the department in contempt. Id., 149. The court, however, stated that the social worker had included in the sworn affidavit "misleading and inaccurate statements," which she knew to be "[un]true and [in]accurate," in order to "mislead the court into believing that [the child] was in immediate physical danger" in the custody of her father. Id., 146, 148–49. The court "[found] the conduct of the department, or its employees, to be . . . outrageous and insensitive"; id., 149; and, in turn, stated that it would employ its "inherent supervisory authority . . . [to] deter similar conduct by the department in the future." Id., 152. The court thus stated: "The *department* is therefore directed, when presenting an application for an ex parte order of temporary custody, to include in its materials all information which is exculpatory or favorable to the parents or guardians." (Emphasis added.) Id., 153. The court additionally ordered the supervisors and administrators of the unit of the department in which the social worker worked to appear before the court and address the steps that the unit had taken to prevent similar misrepresentations from being made to the court in the future. Id.

In assessing whether the union breached its duty of fair representation by failing to argue to the arbitrator that *Lindsey P.* required the plaintiff to disclose the draft report, we emphasize that it is entirely unclear, as a matter of law, whether the directive set forth in *Lindsey P.* applies outside of that case.[17] Indeed, a split of authority among the Superior Courts exists as to whether the directive issued in *Lindsey P.* binds the department in all cases that it brings.[18] At least one other Superior Court has determined that the directive set forth in *Lindsey P.* does not apply outside of that

case. See *In re Heather F.*, Superior Court, judicial district of Middlesex, Docket No. L-15-CP-08008515-A (November 12, 2008). In *In re Heather F.*, a father filed a motion for contempt against the department, alleging that, when the department filed an affidavit from a social worker in conjunction with an application for an ex parte OTC of his child, the department had failed to comply with the directive set forth in *Lindsey P.* Id. Specifically, the father alleged that the social worker excluded from the affidavit information that was exculpatory or favorable to him. See id.

The court, *Bear*, *J.*, determined that the father had failed to establish that the directive set forth by Judge Lopez applied in cases outside of *Lindsey P.* See id. Judge Bear specifically noted that "the court in *Lindsey P.* seem[ed] to have give[n] authoritative instructions to [the department]." (Internal quotation marks omitted.) Id. Because the court in *Lindsey P.*, however, had "used the word 'directed' instead of the word 'ordered' " in its instruction to the department to turn over the exculpatory or favorable information; id.; Judge Bear presumed that Judge Lopez did not *order* the department to include, under penalty of contempt, all exculpatory or favorable information to the parents or guardians in its *future* applications for ex parte orders of temporary custody. See id. The court in *In re Heather F.* additionally stated that, if a social worker failed to include in an application for an ex parte OTC "any, some or all . . . relevant exculpatory or favorable material" to the parents, that information "[could] and mostly like [would] be raised at a contested hearing" concerning the application and would inform the ruling of the court on the application. Id.

In the present case, the plaintiff contends that the union breached its duty of fair representation because it failed to argue to the arbitrator that the directive in *Lindsey P.* required her to disclose the draft investigative report in the manner that she did. As we have emphasized, whether the directive applies outside of *Lindsey P.* is subject to serious debate. The plaintiff does not point us to any authority to support the proposition that the failure of a union to argue that a directive set forth in a Superior Court case, which neither our appellate courts nor, uniformly, our Superior Courts have adopted, required her to act in the present case constitutes arbitrary action or action in bad faith. As we have explained, union agents are not lawyers. Cunningham, in his capacity as a union agent, was not obligated to exercise the degree of skill that a lawyer must exercise when representing a client, so long as he did not act arbitrarily, discriminatorily, or in bad faith. See *Piteau* v. *Board of Education*, supra, 300 Conn. 674 n.7. To conclude that Cunningham acted arbitrarily or in bad faith because he failed to present to the arbitrator this legal argument would be to impose on the union a duty greater than its duty of fair represen-

tation.

Additionally, although the plaintiff appears to argue that the court's directive in *Lindsey P.* obligated *social workers*, such as herself, to turn over to the court *and the parents* any information that is " 'exculpatory' " or favorable to the parents, the plaintiff fails to identify any such directive. We acknowledge that the court in *Lindsey P.* admonished the social worker for excluding from a " 'subscribed and sworn' " affidavit; *In re Lindsey P.*, supra, 49 Conn. Supp. 139, 146; clearly relevant and favorable information to the father. See id., 148–49. The court, however, did not indicate that the *social worker*, personally, had an obligation to turn over to the court and the father any information that was exculpatory and favorable to the father. See id., 153. Rather, the court directed that the *department* must ensure that its initial application for an ex parte OTC includes the exculpatory and favorable information. Id. The court additionally required the *supervisors* of the social worker—not the social worker, personally—to appear before the court to address the remedial efforts that the unit had implemented to assure that misrepresentations would not be made to the court in the future. Id.

Because the court in *Lindsey P.* instructed the *department* to include in its application information that was exculpatory and favorable to the father; see id.; the court's directive arguably was inapplicable to the plaintiff, personally, and did not require or authorize her to send the draft investigative report to counsel for the mother. The plaintiff does not point us to any authority to support the proposition that the failure of a union to formulate a legal argument that misconstrues the case on which it relies constitutes arbitrary action or action in bad faith. Accordingly, we cannot conclude that the board acted unreasonably, arbitrarily, illegally, or in abuse of its discretion by concluding that the union did not breach its duty of fair representation because it failed to argue to the arbitrator that the directive in *Lindsey P.* obligated her to release the confidential, draft investigative report. See *AFSCME, AFL-CIO, Council 4, Local 2405* v. *Norwalk*, supra, 156 Conn. App. 86.

To the extent that the plaintiff contends that the union failed to emphasize sufficiently to the arbitrator that the draft investigative report contained exculpatory information, we conclude that substantial evidence exists in the record to support the board's contrary finding that the union *did* argue that the draft investigative report contained " 'exculpatory' " information. The arbitrator delineated in the arbitration award the differences between the draft and final investigative reports that, according to the arbitrator, the plaintiff thought to be "significant" and that, according to the arbitrator, the plaintiff believed to demonstrate that Fitzpatrick had removed " 'exculpatory' " information from the

final investigative report. As the board noted in its decision, the fact that the arbitrator recognized the differences between the draft and final investigative reports that the plaintiff found to be significant reflects that Cunningham brought these differences to the attention of the arbitrator.

Further, in the plaintiff's postarbitration brief, Cunningham emphasized to the arbitrator that the plaintiff sent the draft investigative report to counsel for the mother because she believed that the final investigative report presented the facts of the family's case in a "false" light and that the information Fitzpatrick had removed was "salient" and "exculpatory . . . ."[19] We conclude, therefore, that the court properly determined that substantial evidence supported the factual finding of the board that Cunningham argued to the arbitrator that the draft investigative report contained exculpatory information. To the extent that this factual finding informed the conclusion of the board that the union did not act arbitrarily or in bad faith in its representation of the plaintiff, we agree with the court that the plaintiff has not met her burden of demonstrating that the board acted unreasonably, arbitrarily, illegally, or in abuse of its discretion by so concluding. See *AFSCME*, *AFL-CIO*, *Council 4*, *Local 2405* v. *Norwalk*, supra, 156 Conn. App. 86.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "[An] employee may seek judicial enforcement of his contractual rights [under a collective bargaining agreement when] . . . the union has sole power under the [agreement] to invoke the higher stages of the grievance procedure . . . and . . . the [employee] has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance. . . . [In such a case, an employee may file a hybrid action, which] comprises two causes of action. The [action] against the employer rests on . . . a breach of the collective-bargaining agreement. The [action] against the union is one for breach of the union's duty of fair representation . . . . [T]he two claims are inextricably interdependent. To prevail against either the [employer] or the [u]nion . . . [the employee] must [show] not only . . . that [her] discharge was contrary to the [agreement] but must also carry the burden of demonstrating breach of [the] duty [of fair representation] by the [u]nion. . . . The [action] is thus not a straightforward breach-of-contract [action] . . . but a hybrid [breach of contract]/fair representation claim, amounting to a direct challenge to the private settlement of disputes under [the collective bargaining agreement]." (Citation omitted; internal quotation marks omitted.) *Piteau* v. *Board of Education*, 300 Conn. 667, 676–77 n.12, 15 A.3d 1067 (2011).

[2] During all relevant times of her employment with the department, the plaintiff was a member of the bargaining unit that the union represented.

[3] The department and its employees refer to the investigative reports as "protocols." For the purpose of clarity, we refer to these reports as "investigative reports" throughout this opinion.

[4] The plaintiff, however, concluded that evidence substantiated the allegation of educational neglect of the daughter.

[5] As we explain in greater detail later in this opinion, the draft investigative report constituted a "confidential" report pursuant to statute. See General Statutes (Supp. 2010) § 17a-28.

[6] The department did not withdraw the application for an OTC of the son, who was hospitalized at the time.

[7] Specifically, Mellon determined that the plaintiff had violated the following department policies: Policy 7-4-3.1, Employee Conduct, Neglect of Duty; Policy 7-4-3.10, Employee Conduct, Confidentiality; Policy 31-8-5, Case

Related Issues, Confidentiality; and Policy 31-10-3, Office of Legal Affairs, Confidentiality. Mellon also concluded that, in his opinion, the plaintiff had violated General Statutes § 17a-28 and § 5-240-1a (c) (8), (11), and (13) of the Regulations of Connecticut State Agencies.

[8] Article sixteen of the collective bargaining agreement provides in relevant part: "No permanent employee . . . shall be . . . dismissed *except for just cause*." (Emphasis added.)

Section 5-240-1a (c) of the Regulations of Connecticut State Agencies defines " '[j]ust cause' " to mean "any conduct for which an employee may be suspended, demoted or dismissed and includes, but is not limited to . . . [d]eliberate violation of any law, state regulation or agency rule . . . [n]eglect of duty, or other employment related misconduct . . . [or] [e]ngaging in any activity which is detrimental to the best interests of the agency or of the state."

Article sixteen of the collective bargaining agreement also provides: "Just cause may include but is not necessarily restricted to incompetency, inefficiency, neglect of duty, misconduct or insubordination."

[9] Because the arbitrator determined that the decision of the plaintiff to release the draft investigative report without authorization from the commissioner or her designee provided the department sufficient just cause to terminate her employment, the arbitrator did not reach the question of whether her release of the confidential information in the e-mails or her decision to leave the child in the car unattended also constituted just cause to terminate her employment.

[10] The arbitrator also rejected the plaintiff's argument that Fitzpatrick improperly had targeted the plaintiff and improperly influenced the decision of the department to terminate her employment.

[11] To the extent that the plaintiff claims in her principal appellate brief that the department violated the collective bargaining agreement by terminating her without just cause, we find it unnecessary to reach this claim. In connection with her hybrid action, the plaintiff not only was obligated to establish "that [her] discharge was contrary to the [collective bargaining agreement] but . . . [she] *also [was required to] . . . demonstrat[e] [a] breach of [the] duty [of fair representation] by the [u]nion*." (Emphasis added; internal quotation marks omitted.) *Piteau* v. *Board of Education*, 300 Conn. 667, 677 n.12, 15 A.3d 1067 (2011). The board determined that the plaintiff failed to establish that the union had breached its duty of fair representation and, thus, did not reach the merits of whether she was terminated for just cause.

[12] Although the plaintiff disclosed the confidential, draft investigative report to counsel for the parent of the child about which the report was created; see General Statutes (Supp. 2010) § 17a-28 (a) and (b); the plaintiff did not argue to the board, to the Superior Court, or to this court that the mother had provided her " '[c]onsent,' " defined as "permission given in writing by a person, his attorney or his authorized representative to disclose specified information, within a limited time period, regarding the person to specifically identified individuals"; General Statutes (Supp. 2010) § 17a-28 (a) (4); to disclose the confidential record.

[13] During oral argument to this court, the plaintiff conceded that the union agent that represented her at the arbitration was not a lawyer.

[14] General Statutes (Supp. 2010) § 17a-28 (f) provides in relevant part: "The *commissioner or the commissioner's designee* shall, upon request, promptly provide copies of records, without the consent of a person, to . . . (9) a party in a custody proceeding under section 17a-112 or 46b-129, in the Superior Court where such records concern a child who is the subject of the proceeding or the parent of such child . . . ." (Emphasis added.)

General Statutes (Supp. 2010) § 17a-28 (m) provides in relevant part: "[A]ny person, regardless of age, his authorized representative or attorney shall have the right of access to any records made, maintained or kept on file by the department, whether or not such records are required by any law or by any rule or regulation, when those records pertain to or contain information or materials concerning the person seeking access thereto, including but not limited to records concerning investigations [or] reports . . . of the person seeking access thereto . . . ."

[15] Alternatively, the plaintiff argues that she should prevail on this claim pursuant to the plain error doctrine. "[The plain error] doctrine . . . is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . It is a rule of reversibility . . . that

this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." (Internal quotation marks omitted.) *Reville* v. *Reville*, 312 Conn. 428, 467–68, 93 A.3d 1076 (2014). "An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable." (Internal quotation marks omitted.) *Board of Education* v. *State Board of Labor Relations*, 166 Conn. App. 287, 297, 142 A.3d 304 (2016). After a thorough review of the record, we are unpersuaded that the board committed the type of obvious and readily discernible error that would meet this extraordinarily high standard and warrant reversal.

[16] The plaintiff properly preserved this claim for review by raising it to the board. See *Ferraro* v. *Ridgefield European Motors, Inc.*, supra, 313 Conn. 758–59.

[17] It is also entirely unclear whether the court had the authority to order the department to engage in a specific procedure when it files OTC applications in the future. The court, sua sponte and apparently without providing the parties with notice or an opportunity to be heard on the directive, stated that, "*under its inherent supervisory authority*, [it could] deter similar conduct by the department in the future" by directing the department to follow a specific procedure when it files future OTC applications. (Emphasis added.) *In re Lindsey P.*, supra, 49 Conn. Supp. 152–53.

In *In re Darlene C.*, 247 Conn. 1, 2, 717 A.2d 1242 (1998), our Supreme Court reviewed a trial court's sua sponte decision to permanently enjoin the commissioner of the department from filing petitions for the termination of parental rights that had been prepared, signed, and filed by individuals who were not admitted to the practice of law. Our Supreme Court ultimately determined that the relevant statutory scheme explicitly permitted individuals who were not admitted to the practice of law to draft and sign such petitions. Id., 9–14. Our Supreme Court further noted, however, that it "disapprov[ed] of the procedure employed by the trial court in rendering an injunction, sua sponte, without first affording the parties notice and an opportunity to be heard." Id., 9 n.22. Our Supreme Court specifically stated that it "[did] not doubt that the action of the trial court, in issuing an injunction against the commissioner, was well intentioned. As [the Supreme Court had] noted previously . . . however, [b]asic principles of courtesy and fairness govern the conduct of courts as well as that of litigants and their counsel. The trial court's conduct did not comport with these principles." (Internal quotation marks omitted.) Id.

Likewise, the court in *Lindsey P.*, in its ruling concerning whether it would hold the department in contempt, sua sponte issued a directive that obligated the department to comply with certain procedures when it files future OTC applications. *In re Lindsey P.*, supra, 49 Conn. Supp. 152–53. Although the court instructed the department to "show cause" concerning why it should not be held in contempt, a thorough reading of its decision does not indicate that it provided the parties with notice or the opportunity to be heard concerning the directive before it set forth the directive. See id., 134. Further, neither the court in *Lindsey P.* nor the plaintiff in the present case has identified a statutory, constitutional, or common-law basis that granted the court the authority to impose on an agency an order that bound the department in its future applications. Although we need not reach whether the court in *Lindsey P.* had the authority to issue such a directive, we emphasize that Cunningham was not obligated to raise to the arbitrator this particular legal question in order to satisfy his duty of fair representation, so long as he did not act arbitrarily, discriminatorily, or in bad faith in his representation.

[18] The plaintiff requests that this court mandate the department to turn over all information that is potentially exculpatory to the opposing party whenever it files an OTC application. We decline to do so. At issue in this case is *not* whether the department must provide to an opposing party in an OTC proceeding all information that is potentially exculpatory. As we have explained, at issue in this case is whether the court improperly determined that substantial evidence supported the findings of the board and whether the board reasonably concluded that the union did not breach its duty of fair representation.

[19] The plaintiff emphasizes in her principal appellate brief that Cunningham acted improperly by using the word " 'believed,' " when he stated in the postarbitration brief that the plaintiff " 'believed' " that the omitted informa-

tion was exculpatory. She specifically argues that, by stating that she " 'believed' " that the information was exculpatory instead of stating that the information "was" exculpatory, Cunningham cast doubt on whether the omitted information was, in fact, exculpatory.

We are not persuaded. The fact that a union agent used one word over another in the postarbitration brief that he filed on behalf of the plaintiff does not constitute action that is "so far outside a wide range of reasonableness . . . as to be irrational," that is fraudulent or deceitful, or that hinders "the best interests of its members." (Internal quotation marks omitted.) *Labbe* v. *Pension Commission*, supra, 239 Conn. 195. Further, the administrative record reflects that the arbitrator considered, and ultimately rejected, the position of the plaintiff that, because the information was exculpatory, she was required to release the draft investigative report. Accordingly, we conclude that the contentions that the plaintiff has raised concerning the specific words used by the union are not sufficient to undermine the board's determination that the union did not breach its duty of fair representation.

———————————————